**Carole TOMKA, Plaintiff–Appellant,**

**v.**

**The SEILER CORPORATION, Daniel Lucey, David Polonsky and Timothy Conroy, Defendants–Appellees.**

**No. 1180, Docket 94–7975.**

United States Court of Appeals, Second Circuit.

Argued March 28, 1995.

Decided Sept. 27, 1995.

Glenn E. Pezzulo, Rochester, NY (Bradley, A. Sherman, Culley, Marks, Tanenbaum, Reifsteck, Potter and Capell, Rochester, NY, on the brief), for Plaintiff–Appellant.

Mark H. Burak, Boston, Massachusetts (Harry L. Manion III, Cooley, Manion, Moore & Jones, P.C., Boston, MA, on the brief), for Defendants–Appellees The Seiler Corporation and Daniel Lucey.

Michael T. Sullivan, Jr., Buffalo, NY (Mary T. Sullivan, Gannon, Gannon & Sullivan, Buffalo, NY, on the brief), for Defendant–Appellee Timothy Conroy.

Before: MINER, PARKER, Circuit Judges, and SCHEINDLIN, District Judge.[1]

SCHEINDLIN, District Judge.

Carole Tomka ("Tomka") appeals from a final judgment of the United States District Court for the Western District of New York, Michael A. Telesca, *Judge*, granting summary judgment to her former employer, The Seiler Corporation ("Seiler") and three former co-employees, Daniel Lucey ("Lucey"), David Polonsky ("Polonsky"), and Timothy Conroy ("Conroy"). Tomka's complaint presents claims of i) hostile environment sexual harassment and retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a)(1) and 1–3(a), and New York's Human Rights Law ("HRL"), N.Y.Exec.Law §§ 296(1)(a) and (3–a)(c); ii) unequal pay in violation of the Equal Pay Act, 29 U.S.C. § 206(d), Title VII, 42 U.S.C. § 2000e–2(a)(1), and § 296(1)(a) of the HRL; and iii) common law assault and intentional infliction of emotional distress. Tomka also claims that Lucey, Conroy and Polonsky should be held liable in both their official and individual capacities for the alleged violations of Title VII and the New York Executive Law.

The district court dismissed the complaint as to Seiler and dismissed all claims except the common law claims against the individual defendants.[2] On appeal, Tomka contends that the district court impermissibly resolved disputed issues of material fact in favor of defendants and failed to credit Tomka's proffered evidence of sex discrimination and unequal pay. Tomka also argues that the district court erred in dismissing her Title VII and HRL claims against the individual defendants in their personal capacities. We agree

---

1. The Honorable Shira A. Scheindlin, of the United States District Court for the Southern District of New York, sitting by designation.

2. In a subsequent Decision and Order, the district court dismissed the remaining claims against the individual defendants without prejudice and with leave to replead should Tomka's federal claims be reinstated after appeal.

with appellant that her hostile work environment, retaliatory discharge, and unequal pay claims against Seiler should not have been dismissed, and we therefore reverse the judgment below in part and remand for further proceedings.

## I. BACKGROUND

Certain facts are undisputed. Seiler's Environmental Services Division provides institutional clients with management of their environmental (i.e. cleaning) staff. Seiler's organizational structure consists of on-site managers, also known as account or location managers, district managers, and unassigned managers who are part of a "Starts and Surveys" team. Account managers are assigned to client facilities where they are responsible for daily supervision of the client's environmental staff, scheduling matters, and interactions with the client's management. District managers are one step above account managers in the Seiler hierarchy and have overall responsibility for an account, its profitability, and interactions with high level client management. Unassigned managers who are part of the Starts and Surveys team assist account managers in opening new accounts by travelling to the account and training ' the client's employees, writing work schedules, and performing other needed tasks.

Tomka began work in Seiler's Environmental Services Division in July, 1987 as an account manager assigned to the Garden State Rehabilitation Hospital in Toms River, New Jersey. Following complaints from the client's management, Seiler transferred her to the Starts and Surveys team in December, 1987. Her supervisor in this division was Ray Taylor ("Taylor"), the director of the Starts and Surveys team. After working on various accounts, Taylor assigned her on December 4, 1988 to work in opening new accounts at the Daybreak Drug and Alcohol Rehabilitation Hospital and the Hill Haven Nursing Home in Rochester, New York. Taylor informed Tomka that she would be

working with Lucey, who was the district manager for the Rochester region.

Tomka subsequently spoke by telephone with Lucey about her responsibilities for the accounts, and Lucey informed her that she should review Seiler's contracts for the job in order to prepare for her assignment.[3] Tomka was also informed that she would be working with Conroy, the location manager for the Hill Haven facility, and Polonsky, a member of the Starts and Survey team who had also been assigned to the Rochester accounts. None of the individual defendants had worked with Tomka prior to her arrival in Rochester.

Most of this case centers on the events which transpired after Taylor assigned Tomka to the Rochester accounts. Tomka claims that Lucey, Polonsky, and Conroy sexually assaulted her following a dinner on December 6, 1988, and that Seiler subsequently terminated her because she complained of these rapes and threatened to pursue criminal charges. Tomka also alleges that the assaults were a continuation of eighteen months of verbal sexual harassment she had previously suffered during her tenure at Seiler. Although the defendants vigorously deny that the sexual assaults and verbal harassment occurred, we assume Tomka's contentions to be true and limit our discussion to her version of the events.

### A. Events Prior to December, 1988

Tomka claims that the work environment at Seiler was permeated with a discriminatory animus towards women in general and that various Seiler supervisors and employees subjected her to sexual jokes, comments, and innuendos. Specifically, Tomka lists a number of incidents which occurred at various locations to which Tomka had been assigned:

i) Mark Toomey, a senior account executive in Seiler's Sales Division, stated that he would buy a diamond bracelet for someone who would be "special" to him; while looking at Tomka, he then stated "I won-

---

**3.** Specifically, Tomka's duties included surveying the entire building, writing work schedules, training employees on the supplies and equipment, cleaning this equipment, and setting up the chain of supervisors and line employees for the facility. Deposition of C. Tomka, January 8, 1992 ("Tomka Dep.") at p. 1059.

der if anyone in this office could be special to me?" Toomey later asked Jim Green, a Seiler manager who was standing with Tomka, if Tomka and Green were sleeping together. Plaintiff's Responses to Seiler's First Set of Interrogatories ("Pl.Resp.") at pp. 4–5;

ii) While on an inspection with Tomka and two other male Seiler employees, Jessie Parker, a district manager, grabbed plaintiff's hand and stated "Carol, when are you going to go out with me?" *Id.;*

iii) Ray Taylor instructed plaintiff to accompany him to Toomey's house for dinner and to bring a bathing suit to use in Toomey's pool; upon arrival at Toomey's house, Toomey expressed disappointment that Tomka was not wearing her bathing suit because he "had been looking forward to seeing her in it." Tomka's Supplemental Responses to Seiler's First Set of Interrogatories ("Pl.Sup.Resp."), at p. 3;

iv) Harry Snook, a senior account executive in Seiler's Sales Division, talked on the phone with Douglass Snook, the Vice President in charge of the Environmental Services Division and stated, with Tomka present, that "and when I am not doing that I'll be in bed with Carole Tomka." Tomka said nothing and left the office from which the call had been made. Pl. Resp. at p. 5.

v) At a required orientation function, a Seiler manager at Tomka's table referred to a radio show that had discussed women's underwear. Pl.Sup.Resp. at p. 3;

vi) While on an inspection with Tomka and two other male Seiler employees, Douglass Snook turned to the two employees and stated "[a] bunch of us were sitting around at dinner the other night and we all wondered does she fuck." Snook looked at Tomka as he made this remark, and then laughed and said, "[n]o, more appropriately does she fuck you?" After Snook laughed again, Tomka walked away from the group. Pl.Resp. at p. 6;

vii) Unidentified male Seiler employees nicknamed Tomka "Sergeant Slaughter" and stated that she had "great legs." *Id.* at p. 7.

Prior to December, 1988, Tomka had not complained to anyone at Seiler about this harassment. *See* Complaint at ¶ 11.

B. *Events of December, 1988*

Tomka began work at the Rochester accounts on December 5, 1988. After work on December 5, Tomka, Lucey, Polonsky, Conroy and Conroy's wife went to dinner at a restaurant in Henrietta, New York. Tomka claims that Lucey directed that Tomka join him, Conroy, and Polonsky for a business dinner. *See* Pl.Resp. at p. 9. Tomka also stated that it was company policy for Seiler employees travelling on start-up business to eat evening meals together and to transact Seiler business during these meals. While defendants dispute that the December 6 dinner was a business dinner, Lucey testified at his deposition that it was "customary" for travelling Seiler employees to eat as a group, *see* Deposition of D. Lucey, January 7, 1992 ("Lucey Dep.") at p. 487, and Conroy testified at his deposition that "[w]e always whenever we met ... discussed business one way or the other." *See* Deposition of T. Conroy, August 21, 1992 ("Conroy Dep.") at p. 330; *see also* Deposition of R. Taylor, May 7, 1992 ("Taylor Dep.") at p. 446 ("On a start-up it was our practice to sometimes talk about the business at meals.").

At the December 5 dinner, all of the participants consumed alcohol. Tomka claims that Lucey encouraged his subordinates to drink, and that he directed the conversation to "vulgar accounts of his exploitation of women." Pl.Resp. at p. 8. Tomka consumed two glasses of wine at the meal, while each of the men continued to drink after the meal ended. *See* Tomka Dep at p. 216; Conroy Dep. at p. 56. At the end of the evening, Lucey gave Tomka a ride to her hotel in his rented car.

The next day, Tomka contends that Lucey again convened a business dinner and ordered that she join him, Conroy and Polonsky at the Holiday Inn Airport bar in Rochester. *See* Complaint at ¶ 18. Although Tomka was "physically afraid" of Lucey and Polonsky, she attended this December 6 dinner because Lucey had instructed her to and she understood "it would be an early evening because Lucey had said he had a seven

o'clock flight the next morning." Tomka Dep. at p. 496. At the Holiday Inn, Lucey repeatedly ordered drinks for Tomka and insisted that she drink with the others. *See* Pl.Resp. at p. 9. Tomka consumed six glasses of wine, and the bar tab—which lists approximately forty drinks and only a small quantity of food—indicates that the others had even more to drink. *See* Tomka Dep. at p. 561; Exh. 62 to Tomka's Statement of Facts.

As the evening wore on, the conversation apparently took a turn for the worse: Tomka alleges that the defendants repeatedly made vulgar remarks about women and talked of past sexual exploits. *See* Pl.Resp. at p. 9. The men teased Tomka about wearing her hair in a bun until she took it down, and Lucey brought a women's garter to the table and placed it in front of Tomka, who put it around her arm. *Id.* at pp. 9–10. By the end of the evening, Tomka admits that she felt intoxicated and had difficulty walking.

After leaving the bar at approximately 11:30 p.m., Tomka "want[ed] to get away from Lucey and Polonsky." Tomka Dep. at p. 496. She initially climbed into an Airport courtesy van, but Conroy assisted her out and helped her into the back seat of Lucey's rental car. Tomka alleges that each of the three men raped her in Lucey's car, an allegation that defendants deny. Pl.Resp. at p. 10. Conroy and Polonsky then drove Tomka, who was inebriated and semiconscious during the assaults, back to her hotel in Conroy's car. At the hotel, Tomka claims that Polonsky directed her to his hotel room, where he raped her again. Complaint at ¶ 24. Tomka, passing in and out of consciousness, was able to eventually free herself and went back to her hotel room. *Id.*

After remembering during the day that she had been assaulted the night before, Tomka left work early on December 7, 1988 and called the Rochester Rape Crisis Center. Tomka was examined at the Crisis Center on December 8 and called Ray Taylor to report that she had been assaulted by Lucey, Conroy and Polonsky. *See* Pl.Resp. at p. 12. Taylor then flew to Rochester and met with plaintiff on December 9. Tomka contends that Taylor promised her that Seiler would

hold her job open and continue to pay her salary while she took whatever time she needed to recover from the assaults. *Id.*

After flying to Pennsylvania to be with relatives, Tomka wrote to Taylor on December 12 to confirm these arrangements. Tomka understood that she was "to take whatever time I need ... to pursue the counseling, medical treatment, and the rest I may require to restore my mental and physical well being." *See* Exh. 9 to Tomka's Statement of Facts. Her letter also stated that Seiler would "cover fully any expenses I incur in getting the help I need," and that all contacts with Seiler were to be made through Taylor. *Id.* Finally, Tomka informed Taylor that she would be seeing a therapist in Philadelphia. *Id.* Tomka never received a response to this letter. *See* Taylor Dep. at p. 224.

## C. *Events After December, 1988*

Seiler subsequently ordered Robert Bowe, its director of corporate security, to investigate Tomka's allegations. Bowe interviewed Conroy, Polonsky and some of the bar and hotel employees. *See* Deposition of Robert Bowe, January 21, 1991, at pp. 67–69, 127–29, 180–81. Although he failed to interview either Tomka or Lucey, Bowe concluded that Tomka had never been assaulted. He did find, however, that Polonsky had acted inappropriately because he had slept with Tomka when she was inebriated. Douglass Snook, who interviewed Lucey, then decided with other Seiler officials to terminate Polonsky because "his attitude and behavior were detrimental to Seiler," and to reprimand and demote Lucey because he had overused his company charge card during the December 6 dinner. *See* Affidavit of J. Douglas Snook, dated November 6, 1993 ("Snook Aff."), at Exh. A.

In January, 1989, Tomka spoke to Taylor by telephone on a number of occasions and asked him how long her benefits would continue. *See* Taylor Dep. at pp. 204–06. She also told him that she was "thinking of pressing criminal charges as well as pursuing other remedies." Complaint at ¶ 30. After conferring with Snook, Taylor told Tomka that Seiler would continue to pay for her counselling expenses and that her salary and bene-

fits would also continue. *Id.* On February 1, 1989, Douglass Snook wrote to Tomka and advised her that "her extended leave with full benefits and pay" would end on February 15, 1989, and that she should report to Taylor to receive her next assignment. Snook Aff. at Exh. A. On February 10, Tomka responded that she was still undergoing medical tests and that she would be willing to supply Snook with the reports from those tests, but that in the interim she expected her salary and benefits to continue indefinitely. *Id.* at Exh. B. On February 20, Snook wrote Tomka that Seiler had not received any doctor's reports regarding Tomka's status, its investigation had concluded that the assaults had not occurred, and Seiler would discontinue her salary and place her employment on inactive status as of February 17, 1995. *Id.* at ¶ 21. Tomka later sent Snook a copy of a doctor's invoice for $100 which prescribed psychiatric treatment. Tomka then commenced this action in December, 1989.

### D. *The District Court's Decision*

In a Decision and Order dated June 7, 1994 ("Opinion"), Judge Telesca granted summary judgment to the defendants on all of Tomka's claims other than the intentional infliction of emotional distress and assault claims against the individual defendants. As to Seiler's liability for hostile work environment sexual harassment, the district court first held that only Lucey could be considered plaintiff's supervisor for purposes of summary judgment. *See* Opinion at pp. 24–25. The court went on to state that the rape of an employee by a supervisor is an event which is sufficiently severe to create an abusive working environment, but, under principles of agency, Seiler would be liable for the assaults only if Tomka could show that Lucey had used his actual or apparent authority to facilitate the assaults. Judge Telesca phrased the issue in the following manner:

> [I]n addition to proving that she was raped, Tomka must also show some nexus between the work environment and the sexual conduct in order to benefit from Title VII's protections. In other words, to hold Seiler liable for the rape, she must show that Lucey used his actual or appar-

ent authority as Seiler's agent to accomplish the rape.

*Id.* at p. 26.

However, the court rejected Tomka's contentions that Lucey had used his apparent authority to convene a mandatory "business dinner" on December 6:

> Tomka also presented no evidence to suggest that she was ordered by Lucey, or that it was Seiler policy for all employees, to attend working dinner meetings while on the road, at the conclusion of the business day. The clear inference from the proof instead shows that the business colleagues, while on the road, quite naturally had dinner together, during which they sometimes discussed progress at the client's premises. On both nights in Rochester, even Mrs. Conroy was invited to attend dinner, and Tomka herself considered inviting a friend.

*Id.* Similarly, the court discounted Tomka's assertions that Lucey had forced plaintiff to drink excessively against her will in order to make her more vulnerable to the assaults. *Id.* at p. 30. After finding that the verbal harassment did not rise to an actionable level of conduct under Title VII, the court dismissed Tomka's hostile environment claims. *Id.* at p. 34.

The district court also dismissed Tomka's claim that Seiler had discharged her in February, 1989 because she had complained of the rapes and had threatened to initiate criminal charges. The court held that "Seiler had a legitimate, non-discriminatory reason to dismiss Tomka: she failed to report for work by February 15, 1989 (which was sixty days after the incident in Rochester) as instructed by Douglass Snook, or to provide a statement from her doctor, as requested by him, justifying her absence for medical reasons." *Id.* at p. 36; *see also* Snook Aff. at ¶¶ 18–23. The court found Tomka had not cast any doubt on Seiler's asserted reason because she had failed to provide any evidence that she had been treated differently than any other Seiler employee would have been under similar circumstances. *See* Opinion at pp. 36–37.

The court next rejected Tomka's equal pay claims. Although it apparently found that

Tomka had made out a prima facie case of wage discrimination, the court held that Tomka had failed to present any evidence to counter Seiler's defense that the wage differentials between Tomka and six male Seiler employees were based on factors other than sex. *Id.* at p. 45.

As to Tomka's remaining claims, the court held that Lucey, Polonsky and Conroy could not be held liable in their individual capacities under either Title VII or the Human Rights Law. *Id.* at pp. 37–41. Finally, the court held that the alleged rapes adequately supported Tomka's claims of assault and intentional infliction of emotional distress under New York law. *Id.* at pp. 41–42. However, the court found no basis to impose *respondeat superior* liability on Seiler for the sexual misconduct of its employees. *Id.* Tomka now appeals.

## II. DISCUSSION

We review the grant of summary judgment *de novo* under the same standard applied by the district court. *See Taggart v. Time Inc.,* 924 F.2d 43, 45–46 (2d Cir.1991). A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact and that the undisputed facts warrant judgment for the moving party as a matter of law. *See* Fed. R.Civ.P. 56(c); *see generally Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden of showing that no factual dispute exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). Thus, in determin-

ing whether a genuine issue has been raised, the inferences to be drawn from the underlying facts revealed in the affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion. *See, e.g., United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

On summary judgment, a court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Donahue,* 834 F.2d at 58 (quoting *Heyman v. Commerce & Industry Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)); *see also Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir. 1994) (a court's duty at the summary judgment stage "is confined ... to issue-finding; it does not extend to issue-resolution"). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994). With these familiar maxims in mind, we turn to Tomka's claims on appeal.

### A. Hostile Work Environment Sexual Harassment

#### 1. *Legal Standard*

Tomka contends that the district court erred in holding that Seiler was entitled to summary judgment on her sexual harassment claim because disputed issues of fact exist as to whether the working environment at Seiler was sufficiently abusive and whether Seiler can be held liable for this hostile environment. Title VII forbids employers from discriminating "against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ..." 42 U.S.C. § 2000e–2(a)(1).[4] It is now well established that two forms of sexual harass-

---

4. Tomka also brings her sexual harassment claim under § 296(1)(a) of the HRL. New York courts require the same standard of proof for claims brought under the HRL as those brought under Title VII. *See, e.g., Miller Brewing Co. v. St. Div. of Human Rights,* 66 N.Y.2d 937, 498 N.Y.S.2d

776, 489 N.E.2d 745 (1985); *Kersul v. Skulls Angels, Inc.,* 130 Misc.2d 345, 495 N.Y.S.2d 886, 888 (Sup.Ct. Queens Co.1985). We will therefore address all of Tomka's HRL and Title VII claims simultaneously.

ment violate Title VII's prohibitions against workplace inequality: i) quid pro quo and ii) hostile work environment harassment. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986); *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (2d Cir. 1992). Because Tomka limits her claims to a hostile work environment theory, we only consider this latter form of sex discrimination.

■ Hostile work environment sexual harassment occurs when an employer's conduct " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404 (quoting 29 C.F.R. § 1604.11(a)(3) (1985)). A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.' " *Harris v. Forklift Systems, Inc.,* — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor,* 477 U.S. at 65, 67, 106 S.Ct. at 2404, 2405) (some internal brackets and quotation marks omitted); *Karibian v. Columbia University,* 14 F.3d 773, 779 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). Whether a workplace should be viewed as hostile or abusive—from both a reasonable person's standpoint as well as the victim's subjective perception—can only be determined by considering the totality of the circumstances. *Harris,* — U.S. at —, 114 S.Ct. at 371.

■ Even if a work environment is found to be abusive, however, a plaintiff "must establish that the conduct which created the hostile environment should be imputed to the employer." *Kotcher,* 957 F.2d at 63 (citing *Meritor,* 477 U.S. at 70–71, 106 S.Ct. at 2407). In *Meritor,* the Supreme Court

declined to announce a definitive rule on employer liability, holding instead that federal courts should be guided by common law principles of agency. *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. We have used *Meritor's* general guidance to derive the following rules of employer liability: if a plaintiff's supervisor is the alleged harasser, an employer will be liable if the supervisor uses "his actual or apparent authority to further the harassment, or if [the supervisor] was otherwise aided in accomplishing the harassment by the existence of the agency relationship." *Karibian,* 14 F.3d at 780. By contrast, where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, or a co-employee of the plaintiff is the alleged harasser, an employer will generally not be liable unless " 'the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it.' " *Id.* (quoting *Kotcher,* 957 F.2d at 63).

### 2. The Hostile Work Environment at Seiler

■ Tomka points to the comments, jokes, and innuendos directed at her during her tenure at Seiler and to the alleged assaults that followed the December 6 dinner as evidence that her work environment was abusive. The district court held that the assaults were sufficiently severe to alter the conditions of Tomka's employment and to constitute actionable sex discrimination. Accepting, as we must, that these assaults occurred, we agree with the district court that even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability.[5] *See Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (allegations of harassment, including a claim of rape, sufficient to state a claim for hostile environment harassment).

---

5. The district court also found that the verbal harassment was not, standing alone, enough to create an abusive working environment. It is true that isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed perva-

sive. *See Carrero v. New York City Housing Authority,* 890 F.2d 569, 577 (2d Cir.1989); *Kotcher,* 957 F.2d at 62. The trier of fact should consider the comments about Tomka's body, innuendos about her sex life, and other lewd remarks, together with the assaults, on the issue of abusive working environment.

However, Tomka must also establish Seiler's responsibility for the sexual misconduct of Lucey, Conroy, and Polonsky.

### 3. *Seiler's Liability For the Acts of Its Employees*

■ Applying *Karibian*'s teachings, the first issue to be considered in determining Seiler's liability for the assaults is whether any of the three individual defendants can be considered Tomka's supervisor. The district court held that Lucey should be treated as plaintiff's supervisor at the summary judgment stage. We agree with the district court that Tomka has alleged facts sufficient to enable a fact finder to find that Lucey acted as plaintiff's supervisor at Hill Haven: although Taylor was Tomka's direct supervisor and Lucey did not give Tomka direction at Hill Haven, Lucey was the district manager responsible for the accounts Tomka had been assigned, including Hill Haven. Lucey's position in the Seiler hierarchy would enable him to review Tomka's performance at Hill Haven and communicate any thoughts about plaintiff to Taylor, thereby affecting Tomka's future with Seiler. This evidence is sufficient to create a fact issue as to Lucey's supervisory role vis-a-vis Tomka, and we therefore treat him as Tomka's supervisor.

The district court also held that neither Polonsky nor Conroy should be treated as Tomka's supervisors. Polonsky was an unassigned starts and surveys manager like Tomka and clearly was not her supervisor. Conroy, who was the account manager at Hill Haven, had no direct control over Tomka's duties, did not have the power to discharge her, and was approximately at a level equivalent to Tomka in the Seiler hierarchy. However, his position at Hill Haven gave him significant control over Tomka's worksite, and he, like Lucey, could report unfavorably on her work. Further, Tomka alleges that Conroy actually controlled much of Tomka's work at Hill Haven. Although the question is a close one, this evidence is sufficient to raise a fact issue as to whether Conroy was Tomka's supervisor, and we treat him as such for purposes of summary judgment.

Thus, Seiler is liable for the assaults if Lucey or Conroy, plaintiff's supervisors, used their actual or apparent authority to accomplish the rape, or if they were otherwise aided by the existence of the agency relationship to carry out the assaults. In short, Tomka must allege facts which establish a nexus between the supervisory authority of Lucey or Conroy and the December 6 rapes. Tomka attempts to do this by arguing that Lucey convened the December 6 dinner as a business meeting, and that the conduct of the individual defendants, including the excessive drinking at the meeting, was part and parcel of the Seiler corporate culture fostered by Lucey and Conroy in their capacity as Seiler's agents.

### 4. *Evidence of Use of Apparent Authority*

Tomka has presented evidence to support her claims. During discovery, Tomka stated that the December 6 dinner was a business meeting convened by Lucey which she felt compelled to attend. Tomka further stated that Seiler employees travelling together on the road often took their meals together, and that business was often discussed during this time. By itself, Tomka's testimony is sufficient to create a fact issue over the nature of the December 6 dinner. However, Lucey also testified at his deposition that it was "customary" for Seiler employees on the road to eat together, Taylor testified it was the "practice" of Seiler employees to "sometimes" talk about business at these meals, and Conroy testified that whenever Seiler employees met for after-work meals business was "always" discussed "one way or the other." Moreover, if the dinners were in fact business meetings, it would certainly be permissible for the trier of fact to find that Tomka felt compelled to attend these meetings; as an out-of-town employee working on a new account, Tomka may have felt that she would be disadvantaged if she failed to attend and receive any valuable information or insight which might be imparted from the various managers at the meeting. This latter proposition might be true even if business was not the sole topic of conversation and the meal took on a social flavor.

Seiler and Lucey also argue that, even if the December 6 dinner was a business meeting, the excessive drinking at the meal was

the proximate cause of the assaults and that Tomka's drinking was voluntary and unconnected to any use of Lucy's apparent authority. Of course, drinking does not cause rape—people do. However, insofar as the drinking at the December 6 meeting made Tomka more vulnerable and facilitated the assaults, this too could be connected by a fact finder to Seiler's delegation of authority to Lucey. First, Lucey charged the drinks at the meeting to Seiler with his company charge card.[6] Second, Tomka testified that the corporate culture at Seiler encouraged drinking, and that she felt forced to drink during the dinner in order to be accepted. While there is no evidence to suggest that Tomka was physically forced to drink six glasses of wine, it would be reasonable for her to feel pressure to drink, given that all of the others were drinking. A fact finder could reasonably conclude that Seiler employees on assignment customarily met after working hours to eat and discuss business, and that Lucey, as the agent of Seiler, used his apparent authority to promote this policy, which included the supplying of alcoholic drinks on the company's credit card.

Of course, there is contradictory evidence in the record that the dinner was simply a social event which Tomka chose to attend and that her consumption of alcohol was likewise voluntary. For example, Conroy's wife was invited to attend both the December 5 and 6 dinners and did attend the December 5 dinner. Conroy stated that he originally did not plan to attend the December 6 dinner. Moreover, Tomka drank much less than either Lucey, Polonsky, or Conroy on December 5, creating an inference that she

also could have stopped drinking at the December 6 dinner before she became intoxicated and hence more vulnerable to the attacks.[7] These issues, however, are for the fact finder. As discussed above, Tomka has presented sufficient evidence to create an inference that Lucey used his apparent authority to convene the December 6 dinner and encourage the free use of alcohol. If the trier of fact were to credit Tomka's testimony that the December 6 dinner was in fact a business meeting convened by Lucey, and that he used his apparent authority to foster the excessive drinking, this would provide the required nexus between that event and the alleged assaults which followed. In short, Tomka has created a series of reasonable inferences that Lucey used his apparent authority to convene the dinner and encourage the drinking which enabled the defendants to rape Tomka. If the fact finder credits these inferences, a sufficient nexus between the assaults and Seiler would be established for liability purposes. Thus, Tomka's sexual harassment claims under Title VII—and thus under the HRL—were incorrectly dismissed by the district court.[8]

### B. Retaliatory Discharge

Tomka contends that the district court improperly dismissed her retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a), and § 296(3–a)(c) of the HRL. According to Tomka, the court improperly resolved all factual inferences in Seiler's favor and failed to credit her evidence that Seiler's decision to discharge her was fueled by a discriminatory animus. Al-

---

**6.** Lucey was eventually reprimanded and demoted by Seiler for the excessive number of drinks charged to Seiler's account at the December 6 dinner. *See* Deposition of Douglass Snook, January 22, 1991 at pp. 248–250. While he may thus have exceeded his authority to use Seiler's corporate charge card, the fact remains that he, as a Seiler officer, can be considered to have acted for the company in buying drinks that night.

**7.** The district court discussed, at some length, Seiler's argument that Tomka's decision to participate in drinking during the December 6 dinner was a proximate cause of the events which followed. We understand the district court's discussion of Tomka's drinking as relevant only to the narrow issue of whether Seiler can be held

liable under Title VII for the alleged assaults. We do not read the district court to suggest that Tomka's drinking that evening can be equated, in any way, with her consent to have sexual intercourse with any of the defendants. Of course, we would reject any such inference were it made.

**8.** We also reject Seiler's argument that its subsequent investigation of the assaults shields it from liability. Under *Karibian,* an employer is liable if a supervisor uses his actual or apparent authority to accomplish the harassment. An employer cannot disclaim liability for such conduct based on a post-harassment investigation. *See Karibian,* 14 F.3d at 780.

though the issue is a close one, we agree with Tomka and reverse the judgment of the district court.

### 1. *Legal Standard*

■ We analyze a claim of retaliatory discharge under the familiar three-part burden shifting analysis first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993). In order to make out a prima facie case of retaliation, a plaintiff must show by a preponderance of the evidence i) participation in a protected activity known to the defendant; ii) an employment action disadvantaging the plaintiff; and iii) a causal connection between the protected activity and the adverse employment action. *See Kotcher*, 957 F.2d at 64 (citing *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991)). Moreover, "the burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion 'at the prima facie stage is *de minim[i]s*'." *Chambers*, 43 F.3d at 37 (quoting *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988)).

■ If the plaintiff meets this burden, the defendant must then articulate a legitimate nondiscriminatory reason for its actions. *Johnson*, 931 F.2d at 207 (citing *Taitt v. Chemical Bank*, 849 F.2d 775, 777 (2d Cir.1988)). If the defendant meets its burden of production, the plaintiff will then have an opportunity to prove that the proffered reason was merely a pretext for retaliation and that the employer's action was prompted by an impermissible motive. *See Hicks*, —— U.S. at ——, 113 S.Ct. at 2746–47; *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 141 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994).

### 2. *Tomka's Prima Facie Case*

■ There is no dispute that Tomka met her burden on the first two elements of the prima facie case. First, Tomka complained of the sexual harassment to Seiler when she spoke with Taylor on December 8 and when she later told him that she was considering legal action. This is sufficient to satisfy the first prong of the prima facie case. *See Kotcher*, 957 F.2d at 65 (internal complaints to company management about sexual harassment constitute protected activity). Second, Seiler disadvantaged Tomka when it discontinued her salary and benefits on February 17, 1989. The issue is thus whether Tomka has alleged sufficient facts to enable a fact finder to infer a causal connection between Tomka's complaints and Seiler's actions on February 17.

Tomka has offered sufficient evidence to infer such a connection. Accepting Tomka's version of events as true, Seiler terminated Tomka just three months after Taylor promised her that her salary and benefits would continue until she had sufficiently recovered from the assaults. In addition, Tomka told Taylor in January, 1989 that she was considering legal action; a few weeks later, Douglass Snook wrote Tomka and informed her that Seiler would terminate her benefits on February 17. As this was the first mention of a termination date, the timing of Snook's letter supports an inference of discrimination sufficient to establish a prima facie case. *See Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986) (inference of discrimination established where protected activity followed closely by adverse personnel actions); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980) (same); *Thermidor v. Beth Israel Medical Center*, 683 F.Supp. 403, 411 (S.D.N.Y.1988) (same).

### 3. *Seiler's Justification*

■ Seiler proffered a legitimate reason for terminating Tomka's salary and benefits: she failed to report to work by February 15, 1989, as instructed by Snook, or to provide medical documentation indicating that her physical condition prevented her from returning to work. It is undisputed that the only medical documentation provided by Tomka was a doctor's invoice, dated February 13, which set forth a diagnosis of post-traumatic stress syndrome, anxiety and depression and prescribed psychiatric or psychological treatment; however, the invoice did not indicate that Tomka was unable to

work. In addition, Seiler notes that it paid Tomka's medical bills and salary for almost three months following the Rochester incident, and that it could legitimately ask for adequate medical documentation justifying Tomka's continued entitlement to these benefits. Seiler's explanation for its decision to terminate Tomka's benefits therefore satisfies its burden to produce a legitimate reason justifying that action.

### 4. *Pretext and Intentional Discrimination*

■ In response, Tomka contends that Seiler was aware that she was receiving medical treatment and was unable to return to work. Tomka told Taylor in December that she was seeing a therapist in Philadelphia and later informed Snook in a February 10 letter that she would be undergoing tests in March to determine her ability to resume work at Seiler. Tomka also offered to send Snook the results of any medical tests, and reiterated that Taylor had promised her that her salary and benefits would continue until she was ready to return. Moreover, Tomka argues that she did not understand that Seiler required an official doctor's note in lieu of her verbal and written communication with Taylor and Snook about her condition, or that the invoice she sent to Seiler did not satisfy their concerns. Tomka claims Snook never specified what, if any, medical documentation was required, or that Seiler would terminate her if she did not provide this material. There is some additional support for this latter proposition in the record: based on the correspondence—submitted by Seiler—between Tomka and Snook, the first mention of Tomka's failure to provide medical documentation is in Snook's February 20 letter, sent *after* Tomka's benefits had been terminated. While Snook claims that he had informed Tomka in January that she needed to provide medical documentation, at the summary judgment stage we must credit

Tomka's assertion that she was not told at that time to provide further proof of her condition.

Additional pieces of evidence cast doubt on Seiler's proffered rationale. First, Tomka—unlike Polonsky, Conroy, or Lucey—was never interviewed by Bowe, Seiler's security director, or by Snook about the alleged assaults. Bowe, however, concluded that the assaults did not take place and Snook accepted and acted on the results of this investigation. Seiler's treatment of the perpetrators was mixed: Polonsky was fired because "his attitude and behavior" did not reflect well on Seiler, Conroy was not disciplined at all, and Lucey was reprimanded and demoted, but only because he had overused his corporate charge card. While Seiler disciplined two of the alleged perpetrators, no mention was made of the alleged assaults as a basis for their punishment. A reasonable inference from Seiler's actions might be that Seiler attempted to "whitewash" the December 6 incident by separating Tomka from the investigation, playing down the assaults, and subsequently terminating Tomka's employment.[9] However, these fact issues must be resolved at trial.

Tomka's evidence, while not overwhelming, is sufficient to raise a fact issue as to whether Seiler's proffered reason was merely a pretext for terminating her salary and benefits. There is a fair amount of ambiguity regarding what and when Snook or Taylor told Tomka about the extent of her leave and the need to provide medical documentation. Similarly, Seiler's investigation of the assaults and treatment of the alleged perpetrators raises concerns over Seiler's true reasons for its actions on February 17, only one month after Tomka complained of the assaults. In this vein, we are mindful that caution must be exercised in granting summary judgment where an employer's intent is

---

9. Tomka also contends that she was treated differently than other male Seiler managers who had been forced to take extended leaves of absence. Specifically, Tomka points to James Leech, another Seiler employee, who allegedly had told her that he had been on sick leave for an extended period of time and that Seiler had continued to pay his salary and medical bills. *See* Pl.Resp. at p. 13. However, there is no

further detail in the record about Leech, the length of time that he had been absent from work, or any explanation of why Seiler had allegedly provided him with an extended leave period with full salary. In short, Leech may have been granted leave under very different circumstances than Tomka, and her assertion does not undercut Seiler's proffered explanation.

genuinely in issue. *See Chambers,* 43 F.3d at 40 (citing *Gallo,* 22 F.3d at 1224). Because material issues of fact remain, Tomka's retaliation claim must be resolved at trial.

## C. Wage Discrimination Claims

Tomka next claims that Seiler violated the Equal Pay Act ("EPA"), Title VII, and the HRL by paying her a lower salary than it paid seven male employees for substantially equal work. The district court dismissed Tomka's wage discrimination claims. We disagree with the district court on Tomka's Equal Pay Act claim as to four of the named employees and therefore reverse the decision below.

### 1. *Equal Pay Act*

In order to state a prima facie case of salary discrimination based on sex under the EPA, 29 U.S.C. § 206(d), a plaintiff must demonstrate that i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974); *Aldrich v. Randolph Central School District,* 963 F.2d 520, 524 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). A plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are "substantially equal." *See Lambert v. Genesee Hospital,* 10 F.3d 46, 56 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). However, jobs which are "merely comparable" are insufficient to satisfy a plaintiff's prima facie burden. *See id.,* 10 F.3d at 56 (citing *Hodgson v. Corning Glass Works,* 474 F.2d 226, 234 (2d Cir.1973), *aff'd,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). Under the EPA, a plaintiff need not prove an employer intended to discriminate against her in order to prevail on her claim. *See Brinkley–Obu v. Hughes Training, Inc.,* 36 F.3d 336, 344 n. 17 (4th Cir.1994); *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1526 (11th Cir.1992).

Once the plaintiff makes out a prima facie case, the burden of persuasion shifts to the employer to prove that the disparity is justified by one of four affirmative defenses: i) a merit system; ii) a seniority system; iii) a system which measures earnings by quantity or quality of production; iv) a differential based on any other factor other than sex. 29 U.S.C. § 206(d)(1); *see also Corning,* 417 U.S. at 196, 94 S.Ct. at 2229. An employer who attempts to justify a pay differential based on a "factor other than sex" must also prove that the gender-neutral factor was adopted for a legitimate business reason. *Aldrich,* 963 F.2d at 526–27 and n. 1 (citing *Kouba v. Allstate Insurance Co.,* 691 F.2d 873, 876 (9th Cir.1982)).

### a. *Tomka's Prima Facie Case*

In her responses to Seiler's interrogatories, Tomka named seven male Seiler employees who allegedly received a higher salary than she did while performing work substantially equivalent to her duties as a Starts and Surveys manager. *See* Pl.Resp. at pp. 13–17. The uncontradicted evidence in the record establishes that the seven employees all received higher salaries than Tomka. *See* Affidavit of Frances Gallitano, Seiler Vice–President of Human Resources, November 9, 1993, at Exh. 1–11. However, the evidence also indicates that Seiler never employed one of the listed employees. *See* Snook Aff. at ¶ 7; Taylor Aff. at ¶ 5. Two other listed employees were district managers responsible for multiple accounts. While the standard under the Equal Pay Act is job content and not job title or description, *see Marshall v. Building Maintenance Corp.,* 587 F.2d 567, 571 (2d Cir.1978), district managers are clearly higher in the Seiler hierarchy and have greater responsibility and supervisory roles than either account managers or unassigned Starts and Surveys managers. Moreover, Tomka has set forth no specific facts to indicate that she performed substantially equal work to either of the two named district managers.

The remaining four Seiler employees listed by Tomka include: Starts and Surveys manager Robert Abrams and account managers Steve Barr, Jeff Dwyer and Ron Jones. Be-

cause Abrams and Tomka held identical jobs and Seiler does not allege that their job duties differed, Tomka has established a prima facie case that they performed substantially equal work. As to Barr, Dwyer and Jones, Seiler admits that the duties of Starts and Surveys and account managers partially overlap: Starts and Surveys managers assist account managers in opening new accounts by surveying the client's building, training the client's employees, and writing work schedules. See Snook Aff. at ¶ 4; Taylor Aff. at ¶ 3. Moreover, both types of managers need to know how the housekeeping contracts at a worksite are to be implemented and how to train and supervise the client's janitorial staff. This evidence implies that both manager positions require substantially equal skill and effort and is buttressed by the fact that Tomka herself was originally hired as an account manager before Seiler transferred her to the Starts and Surveys team.

Seiler claims that the primary difference between the two types of managers is that Starts and Surveys managers have limited supervisory responsibility over a client's employees and that only account managers are assigned to interact with client management on a daily basis. See Snook Aff. at ¶ 4. Presumably, Seiler contends that account managers have more supervisory responsibility over a client's employees because they supervise the employees on an ongoing basis, whereas Starts and Surveys managers only supervise those same employees during start-up training. However, both the nature and scope of supervision during the start-up period are apparently the same for both types of managers: they deal with the same employees, from the same position of authority, concerning the same work. While a Starts and Surveys manager's supervisory role may last for a shorter period of time, it is for the trier of fact to decide if this is a significant enough difference in responsibility to· make the jobs unequal.

Similarly, a fact issue exists over the importance of an account manager's daily interactions with client management. While Seiler claims that this interaction differentiates the account and Starts and Surveys manager positions, Seiler's internal job classifications do not differentiate between the positions, assigning the same pay range to both. See Affidavit of Bonita Cox, Seiler Director of Human Resources, November 9, 1993 at Exh. B. This evidence is recognized as relevant by the Equal Employment Opportunity Commission EPA regulations:

> In determining whether job differences are so substantial as to make jobs unequal, it is pertinent to inquire whether and to what extent significance has been given to such differences in setting the wage levels for such jobs. Such an inquiry may ... disclose that apparent differences between jobs have not been recognized as relevant for wage purposes.

29 C.F.R. § 1620.14 (1994); see also Laffey v. Northwest Airlines, Inc., 567 F.2d 429, 449 (D.C.Cir.1976) (administrative interpretations of the EPA are entitled to great deference in applying the Act to given factual situations), cert. denied, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). Thus, Seiler's decision to classify the jobs in the same compensation range is evidence that the purported differences between the positions may not be substantial. Moreover, Snook described Tomka's transfer to the Starts and Surveys team from an account manager position as "at best a lateral move." Snook Aff. at ¶ 4. While Snook also suggests that Tomka was demoted to the Starts and Surveys team, his assertion is undercut by the fact that Tomka's salary remained the same after her transfer and by Seiler's published statement which characterized the move as a "promotion." See Seiler Trumpet, Spring, 1988, attached as Exh. 9 to Tomka's Statement of Facts. Based on this evidence, a fact finder could reasonably infer that the two positions entailed substantially equal responsibility.

In addition, evidence exists that Starts and Surveys and account managers performed their jobs under similar working conditions. Both types of managers work on-site, often from the same office. Indeed, one of the duties of a Starts and Surveys manager is to organize the office of the account manager. See Snook Aff. at ¶ 4. While Starts and Surveys managers constantly travel to new worksites and spend less time at a facility than account managers, it is for the trier of

fact to determine if this frequent travel results in dissimilar working conditions. For the above reasons, Tomka has established a prima facie case, sufficient to defeat Seiler's summary judgment motion, that she was paid less than Barr, Dwyer and Jones even though they performed substantially equal work under similar working conditions. *See Aldrich,* 963 F.2d at 527.

### b. Seiler's Affirmative Defense

■ In response to Tomka's assertions, Seiler justifies Abrams' and the three account managers' higher salaries by alleging that the discrepancies resulted from "factors other than sex." [10] Seiler contended, and the district court agreed, that Abrams' higher salary resulted from the fact that he had over ten years of experience with a Seiler competitor. While Abrams' experience may very well explain the discrepancy, Seiler has the burden of persuasion to show both that it based Abrams' higher salary on this factor and that experience is a job-related qualification for the position in question. *See id.* at 527. Seiler's mere assertion that Abrams' salary was based on his experience is insufficient to meet this burden, and the district court therefore erred in holding that Seiler had established its "factor other than sex" affirmative defense.

■ As to the account managers, Seiler has also not proved that it based their higher wages on "factors other than sex." Seiler claims to consider a "variety of factors" in determining the salaries for its managers, including experience, education, work and salary history, salary requested, job performance and position applied for. *See* Snook Aff. at ¶ 6. However, Seiler has neither particularized how each of these factors explains the salary discrepancy between Tomka and the three account managers nor demonstrated how any of these factors are job-related to the positions in question. At the most, Seiler's evidence merely raises a fact issue as to whether all or any of these factors can explain and justify the wage differentials between Tomka and the account managers.[11]

In sum, it is for the fact finder to determine if Tomka was paid less for equal work, and, if so, whether Seiler has established that the salary differentials were legitimately based on factors other than sex. Accordingly, the district court improperly dismissed Tomka's EPA claim as to Abrams, Barr, Dwyer and Jones.

### 2. Title VII and the HRL

■ A claim of unequal pay for equal work under Title VII and the HRL is generally analyzed under the same standards used in an EPA claim. *See Laffey,* 567 F.2d at

10. Seiler did not raise any of the EPA's affirmative defenses in its pleadings, and Tomka consequently counter-moved for summary judgment on her EPA claim in response to Seiler's summary judgment motion. Seiler then sought to amend its answer to include a "factor other than sex" affirmative defense, three weeks after Tomka filed her counter-motion. The district court allowed Seiler to amend its answer—over four years after Tomka filed her complaint—but denied *Tomka's* request for additional discovery to develop evidence regarding the new defense. *See* Opinion at pp. 44–45. The district court reasoned that, because pretrial discovery was supervised by a magistrate judge and the parties had argued several motions to compel on the EPA issue, Tomka would not be prejudiced by "Seiler's inadvertent failure to satisfy a technical pleading requirement." *Id.* We find that the district court abused its discretion by permitting Seiler to amend its answer without also more fully considering whether Tomka was entitled to additional discovery, especially as it was Seiler's failure to plead its affirmative defense which

shaped Tomka's arguments at the summary judgment stage. A plaintiff's failure to anticipate an unasserted affirmative defense should not work to its detriment. On remand, the district court should determine whether Tomka is entitled to additional discovery on Seiler's "factor other than sex" defense.

11. Although the district court did not consider Tomka's counter-motion for summary judgment on her EPA claim, it would be pointless to remand the case without deciding her counter-motion. As discussed above, the trier of fact must first determine whether the Starts and Surveys and account manager positions are substantially equal. Tomka cannot prevail at the summary judgment stage because whether these jobs are substantially equal is a question of fact, not law. In addition, summary judgment for Tomka would be inappropriate because the factors listed by Seiler in support of its affirmative defense raise issues of fact regarding the true reasons for the salary discrepancies. Accordingly, Tomka's counter-motion is denied.

446. However, unlike an EPA plaintiff, a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination. *See Aldrich,* 963 F.2d at 528. Tomka has failed to produce any **evidence** that Seiler paid her less than Abrams or the three account managers because of her gender. Rather, she relies on the fact that those employees were paid more than she was and that they are men. These facts do not support an inference that Seiler acted with a discriminatory intent, and Tomka's claims under Title VII and the HRL were therefore properly dismissed by the district court. *Id.; Brinkley–Obu,* 36 F.3d at 344 n. 17; *Miranda,* 975 F.2d at 1526.

### D. Individual Liability

Tomka sued Lucey, Conroy, and Polonsky in their corporate as well as their individual capacities for the alleged violations of Title VII and the HRL. Although we have not had previous occasion to address this issue, courts in this circuit are divided over whether an employer's agent may be held individually liable under Title VII. *Compare Goodstein v. Bombardier Capital, Inc.,* 889 F.Supp. 760, 763–65 (D.Vt.1995) (Parker, J.) (agent liability); *Dirschel v. Speck,* 1994 WL 330262, * 5–6, 1994 U.S.Dist. Lexis 9257, * 20–24 (S.D.N.Y. July 6, 1994) (same); *Bridges v. Eastman Kodak Co.,* 800 F.Supp. 1172, 1179–80 (S.D.N.Y.1992) (same) *with Bakal v. Ambassador Construction,* 1995 WL 447784, * 3–4, 1995 U.S. Dist. Lexis 10542, * 8–12 (S.D.N.Y. July 28, 1995) (no agent liability); *Coraggio v. Time, Inc.,* 1995 WL 242047, * 7–8, 1995 U.S.Dist. Lexis 5399, * 22–27 (S.D.N.Y. April 26, 1995) (same). Indeed, Judge Parker's thoughtful dissent reflects the contentiousness of the issue. We now hold that individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII. Under the HRL, however, the individual defendants may be sued in their personal capacities for the sexual harassment.

#### 1. *Title VII*

■ The starting point in any statutory construction case, of course, is the language of the statute. *See Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985) (citations omitted). Title VII defines "employer" in relevant part as

 a person engaged in an industry affecting commerce who has fifteen or more employees ... **and any agent of such a person.**

42 U.S.C. § 2000e(b) (emphasis added). The meaning of "agent" as used in this section has engendered a significant split among federal courts. Some courts have held that the literal language means supervisory personnel and other agents of the employer are statutory "employers" who may be held individually liable for discriminatory acts. *See, e.g., Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989), *rev'd in part, aff'd in relevant part,* 900 F.2d 27 (4th Cir.1990) (en banc); *Goodstein,* 889 F.Supp. at 764–65; *Bridges,* 800 F.Supp. at 1180; *Cheng v. Tams Consultants, Inc.,* 1991 WL 79198, * 2–3, 1991 U.S.Dist. Lexis 6095, * 4–7 (S.D.N.Y. May 2, 1991). By contrast, at least three circuits and a number of district courts have interpreted this section not as creating individual liability but as a simple expression of respondeat superior: discriminatory personnel actions taken by an employer's agent only create liability for the employer-entity. *See Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583, 587 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994); *Grant v. Lone Star Company,* 21 F.3d 649, 651–53 (5th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991); *Coraggio,* 1995 WL 242047 at * 7–8, 1995 U.S.Dist. Lexis at * 22–27.

■ It is well-established that "in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1554, 95 L.Ed.2d 39 (1987) (citations and internal quotations omitted). In addition, the plain meaning of a statute is normally controlling, "except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters."

*Samuels, Kramer & Co. v. C.I.R.*, 930 F.2d 975, 979 (2d Cir.) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)), *cert. denied*, 502 U.S. 957, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991); *see also* 2A *Sutherland Statutory Construction*, § 46.07 (5th ed. 1992). In such cases, it is the "intentions of the legislators, rather than the strict language, that controls." *Id.*

▇▇▇ We find § 2000e(b) to be such a rare case. While a narrow, literal reading of the agent clause in § 2000e(b) does imply that an employer's agent is a statutory employer for purposes of liability, a broader consideration of Title VII indicates that this interpretation of the statutory language does not comport with Congress' clearly expressed intent in enacting that statute. In particular, we find that the statutory scheme and remedial provisions of Title VII indicate that Congress intended to limit liability to employer-entities with fifteen or more employees. A finding of agent liability, moreover, would lead to results that Congress could not have contemplated.

### a. The Statutory Scheme

The agent clause is part of a sentence that limits liability to employers with fifteen or more employees. *See* 42 U.S.C. § 2000e(b). In *Maxwell's Int'l*, the Ninth Circuit reasoned that Congress decided to protect small employers "in part because Congress did not want to burden small entities with the costs associated with litigating discrimination claims." *Maxwell's Int'l*, 991 F.2d at 587. Thus, the court held that it was "inconceivable" that a Congress concerned with protecting small employers would simultaneously allow civil liability to run against individual employees. *Id.* We agree with this analysis.

The relevant legislative history of Title VII is consistent with this conclusion. First, the floor debate over § 2000e(b) indicates that the costs associated with defending against discrimination claims was a factor in the decision to implement a minimum employee requirement. In discussions over a proposed change to the minimum employee threshold, the burdens placed upon a small business forced to comply with federal regulations and defend against a Title VII suit were explicitly addressed. *See* 110 Cong.Rec.S. 13092 (1964) (Remarks of Sen. Cotton); 110 Cong. Rec.S. 13088 (1964) (Remarks of Sen. Humphrey); 110 Cong.Rec.S. 13092–93 (1964) (Remarks of Sen. Morse). As the dissent correctly notes, other factors were also considered by Congress in enacting § 2000e(b), including the protection of intimate and personal relations existing in small businesses, potential effects on competition and the economy, and the constitutionality of Title VII under the Commerce Clause. *See, e.g.,* 110 Cong.Rec. 7088 (1964) (Remarks of Sen. Stennis); 110 Cong.Rec.S. 7207–17 (Remarks of Sen. Clark). While these latter reasons do not directly support the proposition that Congress was concerned with the burden of potential liability on small employers, there is a noticeable absence of any mention of agent liability in the floor debates over § 2000e(b). Indeed, most of the comments directed at the minimum employee threshold refer only to employer-entities, implying that Congress did not contemplate agent liability under Title VII. *See, e.g.,* 110 Cong.R. 6566 (1964) (letter from minority membership of the House Committee on the Judiciary) ("Coverage [of Title VII] is limited to businesses and labor organizations affecting commerce."); 110 Cong.R. 7212 (Remarks of Sen. Clark).

### b. Title VII's Remedial Provisions

Title VII's remedial provisions also lead us to conclude that Congress never intended to hold agents individually liable for violations of the Act. Before Congress enacted the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("CRA of 1991"), a successful Title VII plaintiff was typically limited to reinstatement and backpay as potential remedies. *See* 42 U.S.C. § 2000e–5(g)(1). Clearly, backpay and reinstatement are equitable remedies which are most appropriately provided by employers, defined in the traditional sense of the word. *See Padway v. Palches*, 665 F.2d 965 (9th Cir.1982). While it might be argued that a supervisory employee with the power to hire, fire or discipline a plaintiff should be treated as an "employer" because the supervisor has the power to reinstate and correct

employment records, *see Grant,* 21 F.3d at 653, this interpretation would require a court to differentiate between supervisors with the power to hire and fire from supervisors without these powers. Because Title VII speaks only of "agents," there is no basis in the statute for this distinction. *See id.* Moreover, the dissent's suggestion to leave such difficulties to the discretion of the district court fails to consider the lack of any differentiation among "agents" in the statute and would in any event provide little clear guidance for a court confronted with the issue. It is therefore unlikely that Congress intended to subject agents to liability for reinstatement and backpay.[12]

The CRA of 1991 adds compensatory and punitive damages to the remedies available to a victim of intentional discrimination.[13] Although money damages are of the type that an individual can normally be expected to pay, Congress calibrated the maximum allowable damage award to the size of the employer and failed to repeal the exemption for defendants with less than fifteen employees.[14] In addition, the CRA of 1991 does not contain similar limits on damage awards against agents of an employer, or even address the subject of individual liability.

Thus, it appears that Congress contemplated that only employer-entities could be held liable for compensatory and punitive damages, because "if Congress had envisioned individual liability ... it would have included individuals in this litany of limitations and discontinued the exemption for small employers ..." *Maxwell's Int'l,* 991 F.2d at 588 n. 2.

Moreover, the practical implications of agent liability would create potential inequities that Congress could not have intended when it enacted the CRA of 1991. The dissent correctly notes that a prerequisite to agent liability is a finding that the complained-of conduct can be imputed to the employer. *See Kotcher,* 957 F.2d at 63 (citation omitted). In addition, a Title VII plaintiff will rarely file a suit against the agent alone, because the plaintiff has the best chance of recovering from the employing entity. However, it is not difficult to imagine a situation in which an agent may still be forced to bear the brunt of a Title VII judgment. For example, the employer-entity may file for bankruptcy, leaving the agent as the only defendant exposed to liability. Similarly, a plaintiff who settles with a corporate defendant may continue a Title VII suit against the agent, as the plaintiff did in

---

**12.** Although the issue of individual liability was not raised, we affirmed a backpay award against an employer and four individual defendants, jointly and severally, in *Cornwell v. Robinson,* 23 F.3d 694 (2d Cir.1994). The fact that an employer's agent is able to pay a monetary sum designated as backpay does not mean that Congress intended agents to be individually liable for such relief. Backpay, like reinstatement, is most naturally provided by employer-entities.

**13.** Because the actions giving rise to Tomka's Complaint occurred between 1987 and 1989, the compensatory and punitive damage provisions of the CRA of 1991 do not apply to her claims. *See Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (compensatory and punitive damage provisions of the CRA of 1991 do not apply retroactively). However, in most of the cases which relied on the changes wrought by the CRA of 1991 to find that agents could not be held individually liable under Title VII, the plaintiff was limited to backpay and reinstatement as potential remedies. *See, e.g., Maxwell's Int'l,* 991 F.2d at 587; *Grant,* 21 F.3d at 651–53. We agree that the CRA of 1991 is a valuable source of insight into Congress' intent on the issue of individual liability, even in a pre–1991 case.

**14.** Specifically, 42 U.S.C. § 1981a(b)(3) provides in relevant part:

(3) **Limitations**
The sum of the amount of compensatory damages awarded under this section ... and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—
(A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $ 50,000;
(B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000;
(C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000;
(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.
"Respondent" is defined in relevant part by 42 U.S.C. § 2000e(n) to include "employers."

*Maxwell's Int'l.* In such a situation, the agent's liability for compensatory or punitive damages would depend on the size of the agent's employer. Thus, an agent for an employer with 110 employees would be potentially liable for damages of $100,000; if the agent's employer had 100 employees, however, the agent would be liable for $50,000. It is doubtful that such an anomalous result was contemplated by a Congress that failed even to address individual liability.

### c. *Response to the Dissent*

Although we have already addressed a number of contentions raised by the dissent, we offer the following additional points in respectful rebuttal. The dissent suggests that a reading of the "agent" clause which permits liability only against the employer-entity would reduce that clause to "surplusage." The dissent reasons that even absent this clause, Title VII would nevertheless permit *respondeat superior* liability against employer-entities for the acts of their agents under common law liability principles. However, the Supreme Court in *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408, stated that "Congress' decision to define employer to include any 'agent' of an employer. . . . surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." This statement implies that the agent clause does serve an independent purpose with regard to the scope of an employer's vicarious liability for the acts of its agents: namely, that an employer's liability should be based on common law agency principles. *Id.* at 72, 106 S.Ct. at 2408. In *Karibian*, this Court applied the principles of *Meritor* to set the standards under which an employer would be liable for the acts of supervisors and lower level employees. Indeed, what *Meritor* and its progeny conclusively establish is that the agent clause is not mere surplusage, because Congress explicitly chose to apply agency principles to a determination of the scope of an employer's liability.

Moreover, the dissent's statement that traditional agency principles should guide an inquiry into agent liability is not required by *Meritor.* Although *Meritor* instructs courts to look to common law agency principles in discussing employer liability, it also cautioned that "such common law principles may not be transferable in all their particulars to Title VII." *Id.,* 477 U.S. at 72, 106 S.Ct. at 2408. We find this statement to be particularly applicable in the context of *agent* liability, as opposed to an *employer's* liability for the acts of its agents. In the former context, for example, traditional agency principles would require joint and several liability by the employer and agent for discriminatory conduct on the part of the agent. As fully discussed above, such liability is directly in conflict with Title VII's statutory scheme and remedial provisions.

The dissent also notes that employer-entities and their agents can face unlimited civil liability under 42 U.S.C. § 1981 for discriminatory acts that may also be cognizable under Title VII. Thus, the dissent contends that Congress was not concerned with the impact of civil liability on small employer-entities—and thus agents—when it limited liability to employers with at least 15 employees. The fact remains, however, that we are concerned here with an interpretation of Title VII, not § 1981. Section 1981 and Title VII provide distinct causes of action and different liability schemes. Unlike a Title VII plaintiff, for example, a § 1981 claimant need not exhaust EEOC remedies before filing suit against an employer. Whereas § 1981 only prohibits racial discrimination, Title VII covers discrimination based on sex, color, national origin, and religion. More importantly, a Title VII plaintiff is only entitled to compensatory and punitive damages calibrated by employer size; there are no corresponding limits imposed on a § 1981 claim. Title VII also limits backpay awards to two years, while § 1981 permits unlimited backpay. *See* 42 U.S.C. § 2000e–5(g)(1); *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). Finally, although a plaintiff may not recover damages under both Title VII and § 1981, *see* 42 U.S.C. § 1981a(a)(1), the CRA of 1991 expressly provides that limitations imposed on damage awards under Title VII should "not be construed to limit the scope of, or the relief available under, section 1981 of this title."

42 U.S.C. § 1981a(b)(4). These significant differences in the statutory enforcement mechanism, coverage, and remedial provisions of § 1981, as distinguished from Title VII, reveal that the breadth of one statute provides no support for divining the intent of Congress in limiting the coverage of the other.

In sum, the dissent's interpretation of a single provision produces a result at odds with Congress' intent, as expressed through the statutory scheme, to limit liability to employer-entities. *See Samuels, Kramer & Co.,* 930 F.2d at 979 (citation omitted). Accordingly, we hold that an employer's agent may not be held individually liable under Title VII. The district court therefore correctly dismissed Tomka's Title VII claims against Lucey, Conroy, and Polonsky.

### 2. *Human Rights Law*

██ The HRL defines "employer" in terms of the number of persons employed and "provides no clue to whether individual employees of a corporate employer may be sued under its provisions." *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984) (citing N.Y.Exec.Law § 292(5)). In *Patrowich,* the New York Court of Appeals held that an employee is not individually subject to suit under § 296 of the HRL as an employer "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Id.* at 542, 483 N.Y.S.2d 659, 473 N.E.2d 11. None of the three individual defendants has an ownership interest in Seiler, and plaintiff has not alleged that either Polonsky or Conroy had the power to hire or fire her. As to Lucey, no evidence has been presented to indicate that he could hire or fire Tomka, or any other Seiler employee. Although Lucey's position as district manager gave him supervisory control over Tomka's worksite and would presumably enable him to review and comment on her performance in Rochester, it was Ray Taylor, the director of the Starts and Surveys team, who had assigned Tomka to Rochester and who apparently had the authority to make personnel decisions about Starts and Surveys team members.

However, § 296(6) of the HRL states that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y.Exec.Law § 296(6) (emphasis added). Based on this language, several courts have distinguished *Patrowich* by holding that a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the HRL. *See, e.g., Poulsen v. City of North Tonawanda, N.Y.,* 811 F.Supp. 884, 900 (W.D.N.Y.1993); *Bridges,* 800 F.Supp. at 1180–81; *Wanamaker v. Columbian Rope Co.,* 740 F.Supp. 127, 135–36 (N.D.N.Y.1990); *but see Falbaum v. Pomerantz,* 891 F.Supp. 986 (S.D.N.Y.1995). In the present case, Tomka has alleged that each of the individual defendants assaulted her and thereby created a hostile working environment. This allegation is sufficient to satisfy § 296(6), and the district court thus incorrectly dismissed Tomka's sexual harassment claims against the individual defendants in their personal capacities under the HRL.

### E. Tort Claims

Tomka claims that the district court improperly dismissed the assault and intentional infliction of emotional distress claims against Seiler. The only conduct relevant to these claims is the alleged rapes, because the district court had previously dismissed all other claims of assault and intentional infliction of emotional distress based on conduct occurring prior to December 6, 1988. *See* Decision and Order of June 29, 1990.

██ Under New York law, the doctrine of *respondeat superior* renders an employer vicariously liable for a tort committed by an employee while acting within the scope of his employment. *See Riviello v. Waldron,* 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 391 N.E.2d 1278 (1979); *Heindel v. Bowery Savings Bank,* 138 A.D.2d 787, 525 N.Y.S.2d 428 (3d Dep't 1988). However, an employer is not liable for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business. *Heindel,* 525 N.Y.S.2d at 428; *Island Associated Coop., Inc. v. Hartmann,* 118 A.D.2d 830, 500

N.Y.S.2d 315, 316 (2d Dep't 1986). The district court held, and we agree, that the alleged assaults of December 6, 1988 were not in furtherance of Seiler's business and were a complete departure from the normal duties of a Seiler employee. *See, e.g., Heindel,* 525 N.Y.S.2d at 428 (mall not liable for rape of girl committed by mall security guard in mall security office); *Cornell v. State of New York,* 60 A.D.2d 714, 401 N.Y.S.2d 107 (3d Dep't 1977), *aff'd,* 46 N.Y.2d 1032, 416 N.Y.S.2d 542, 389 N.E.2d 1064 (1979) (hospital not liable for sexual assault by hospital attendant on an infant under hospital's care). Thus, Tomka as a matter of law cannot hold Seiler liable for the assaults and the emotional distress stemming from those acts.

■ Furthermore, Tomka has not produced sufficient evidence to raise a fact issue that Seiler should be liable because it was negligent in retaining or supervising its employees. Although Tomka claims that Lucey had previously raped and sexually harassed another female Seiler employee, Tomka has produced no evidence of prior assaults or sexual misconduct by Lucey. Similarly, Tomka's allegation that Seiler fostered heavy drinking and reckless and abusive conduct is insufficient to put Seiler on notice that Lucey, Polonsky, or Conroy would sexually assault a female employee at a start up worksite. The district court correctly dismissed the common law claims against Seiler.

## CONCLUSION

We reverse the district court's judgment on Tomka's Title VII and HRL claims of sexual harassment and retaliation against Seiler, and on her claims of sexual harassment under the HRL against the individual defendants. We also reverse the district court's judgment on Tomka's Equal Pay Act claim against Seiler. We affirm the judgment of the district court on all other claims, and remand for trial.

So Ordered.

PARKER, Circuit Judge, dissenting:

Concurring in all but one aspect of our holding today, I write separately in dissent only as to the narrow issue of whether an employer's agent may be held individually liable for discriminatory acts under Title VII. I believe that the express language of the statute permits individual liability under Title VII and that sound jurisprudence counsels giving that statutory language its full effect.

The majority opinion correctly notes that Carole Tomka cannot recover either punitive or compensatory damages under Title VII because the alleged discriminatory conduct in this case occurred prior to November 1991. Therefore, Tomka's potential relief for the alleged Title VII violations is limited to the equitable remedies provided for under 42 U.S.C. § 2000e–5(g) prior to the 1991 amendments:

If the court finds that the **respondent** has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the **respondent** from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the **employer,** employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g)(1) (1988) (emphasis added).

Title VII defines the term "respondent" to include "employers" as well as employment agencies, labor organizations and certain other supervisory bodies "controlling" specific federal employment and retraining programs. 42 U.S.C. § 2000e(n). Title VII specifically defines the term "employer" as

a person engaged in an industry affecting commerce who has fifteen or more employees ... **and any agent of such a person. . . .**

42 U.S.C. § 2000e(b) (emphasis added).

Based on a literal reading of the statutory language, I would hold that Title VII permits a successful plaintiff to receive all relief provided for under the statute—in this instance limited to equitable relief—against an employer "and any agent of such a person,"

jointly and severally, as outlined below. For this reason I disagree with, and respectfully dissent from, the majority opinion holding that an employer's agent cannot be individually liable under Title VII.

The majority, citing *Miller v. Maxwell's International Inc.*, 991 F.2d 583 (9th Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994), reads the "agent" clause to permit recovery available for Title VII violations only against the "employer/entity," under the doctrine of *respondeat superior*. I dispute this reading primarily because I believe it violates two independent canons of statutory construction.

First, the majority's reading reduces the agent clause to surplusage. Absent this clause, Title VII would nevertheless permit *respondeat superior* liability against employers for the acts of their agents under common law liability principles. Indeed, *respondeat superior* liability is so fundamental to the employment context that the term "employer" is commonly defined to include agents acting on the employer's behalf. *See* Webster's Third International Dictionary 743 (1961) (including "an agent acting for such an enterprise in employing persons"). It is well-established that, without some clear indication that Congress intended otherwise, courts must not construe the language of a statute in a manner which renders a provision of that statute mere surplusage. *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.1985).

In addition, I believe the majority, and the cases upon which it relies, overreach our role as courts:

> In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.

*Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). This long-standing view of statutory construction is grounded upon a jurisprudential interest in the separation of federal powers under the Constitution.

It is urged, however, that if the literal meaning of the statute be [as defined], that meaning should be rejected as leading to absurd results, and a construction adopted in harmony with what is thought to be the spirit and purpose of the act in order to give effect to the intent of Congress. [This] principle is to be applied to override the literal terms of a statute only under rare and exceptional circumstances. [Cases which have done so] demonstrate that to justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense. And there must be something to make plain the intent of Congress that the letter of the statute is not to prevail.

Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter ... [T]he remedy lies with the law making authority, and not with the courts.

*Crooks v. Harrelson*, 282 U.S. 55, 59–60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930) (citations omitted) (accord *Crandon v. United States*, 494 U.S. 152, 168, 110 S.Ct. 997, 1006, 108 L.Ed.2d 132 (1990)).

Here, the statute speaks with such clarity that there is no need to look beyond the statutory language in an attempt to divine Congressional intent. Absent a clear showing that a literal reading of Title VII is at war with itself, or an articulation of exceptional circumstances to justify further judicial inquiry, that inquiry should not proceed.

Courts which have held that there can be no individual liability under Title VII have uniformly failed to identify any rare and exceptional circumstances or other indicia making "plain the intent of Congress that the letter of the statute is not to prevail." Instead, these courts proceed from a premise that a literal reading of the statute leads to

manifestly illogical consequences. Upon this premise, they justify a new judicial gloss limiting liability under Title VII exclusively to *respondeat superior* liability and, as a consequence, insulating employers' agents from liability for any discriminatory acts that they have perpetrated.

I find this reasoning wholly unpersuasive. A literal reading of Title VII reveals a remedial scheme which is neither objectionable nor absurd. Furthermore, so restrictive a reading of the statute contradicts Congress' avowed desire that Title VII be construed consistent with its broad remedial purpose. *See* Sec. 209: Construction, H.R.Rep. No. 102–40(I), 102d Cong., 1st Sess. 113 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 651 (1992); *Sheehan v. Purolator Courier Corp.,* 676 F.2d 877, 885, 887 (2d Cir.1982); *Guardians Assoc. of New York Police Dept., Inc. v. Civil Service Commission,* 633 F.2d 232, 254 (2d Cir.1980) (quoting *Culpepper v. Reynolds Metals Co.,* 421 F.2d 888, 891 (5th Cir.1970) ("It is, therefore, the duty of the courts to make sure that the Act works, and the intent of Congress is not hampered by a combination of a strict construction of the statute and a battle with semantics.")) Therefore, I see no basis, in the statute or elsewhere, for reading the agent clause to impose only *respondeat superior* liability, to the exclusion of joint and several liability, between an employer and his or her agent (thus, necessarily permitting some degree of individual liability on the part of the agent) under Title VII.

### A Literal Reading of Title VII

All courts which have considered the matter agree that, by adding the agent clause to the statutory definition of "employer," Congress sought to make discriminatory acts by both employers (in the traditional sense of the term) and their agents, actionable under Title VII. The question before us is whether Congress intended that agent clause to permit only *respondeat superior* liability upon the employer for the acts of his or her agent, or rather, to also permit holding employers and their agents jointly and severally liable for the discriminatory acts of the agent.

To aid in this inquiry, the Supreme Court instructs us that "Congress wanted courts to look to agency principles for guidance ..." *Meritor Savings Bank, F.S.B. v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) (citing, generally, Restatement (Second) of Agency §§ 219–237 (1958)). *Meritor* itself outlines the contours of Title VII liability for sexual harassment consistent with traditional agency principles. While the issue of individual liability for an employer's agent was not before the Court in *Meritor,* its focus upon traditional agency principles suggests that joint and several liability between an agent and his employer, thus individual liability for the agent, is logically consistent with the Court's broader discussion of sexual harassment actionable under Title VII.

The Court's direction that we look to traditional agency principles, and to the Restatement in particular, is instructive. Indeed, the Restatement itself prescribes joint and several liability, as opposed to mere *respondeat superior* liability, for tortious conduct committed against a third party by either an agent alone, or an agent together with that agent's principal. Restatement (Second) of Agency § 217B(1) (1958). If, as *Meritor* suggests, Congress intended to incorporate traditional agency principles in determining whether an agent's acts implicate Title VII liability, there is no inconsistency in reading the agent clause as evidence that Congress further intended to incorporate these same traditional agency principles with regard to the scope of that liability. Accordingly, I believe Title VII permits employers and their agents to be held jointly and severally liable for "the tortious conduct of an agent or that of agent and principal." *Id.*

As may be gathered by the foregoing, a literal reading of the agent clause in Title VII suggests Congress not only intended to make discriminatory acts by both employers and their agents actionable under Title VII, but also, that Congress intended to make those who discriminate, both employers **and** agents acting under the cloak of authority of their employers, answerable, jointly and severally, for those discriminatory acts. I would hold that the statute means what its words say: Both employers of 15 or more persons

and their agents may be held liable for Title VII violations.

### Miller and its Progeny

Nevertheless, today this Circuit joins several other circuits in holding that Congress intended to restrict Title VII liability to *respondeat superior* liability against an agent's employer. This view of the statute, articulated most fully by the Ninth Circuit in *Miller*, is based upon several assumptions regarding Congressional intent, none of which survive closer scrutiny. As stated earlier, I believe that further inquiry into the intent of Congress is unwarranted in this case. Nonetheless, as the majority now adopts the *Miller* analysis, it is necessary to briefly address the substance of that analysis.

*Miller* offers three separate grounds for its holding. First, the *Miller* panel acknowledges that it was bound by prior circuit precedent, barring individual liability for backpay and reinstatement, announced in *Padway v. Palches*, 665 F.2d 965, 968 (9th Cir.1982), "which, in any event, announced the better rule." *Miller*, 991 F.2d at 587. Second, *Miller* cites the statutory definition of the term "employer," which limits the term to those who employ fifteen or more employees, as evidence that Congress "did not intend to impose individual liability on employees." *Id.* Finally, the court points to the liability caps adopted as part of the 1991 amendments to Title VII as support for its contention that Congress never envisioned individual liability for an employer's agent. *Id.* at 587 n. 2. Careful consideration of these three arguments underscores the danger in replacing a legislative articulation of the statute with our own.

First, though not bound by *Padway*, the majority relies upon its holding for the proposition that "[c]learly, backpay and reinstatement are equitable remedies which are most appropriately provided by employers, defined in the traditional sense of the word." *Padway* indeed holds as much; however, the reasoning underlying its holding warrants that we exercise great caution in adopting its conclusion.

The full extent of *Padway's* reasoning on this point consists of the statement that Title VII,

> speaks of unlawful practices by the employer, and not of unlawful practices by officers or employees of the employer. Back pay awards are to be paid by the **employer.** The individual defendants cannot be held liable for back pay.

*Padway,* 665 F.2d at 968 (emphasis in original) (citations omitted). *Padway*'s unqualified emphasis upon the term "employer" raises the question whether the panel was aware of the broader definition of the term "employer" under Title VII. Moreover, by excluding the unlawful practices of "officers or employees of the employer" from the purview of Title VII, *Padway* appears to preclude an interpretation of the "employer" definition in Title VII as permitting even *respondeat superior* liability for discriminatory acts perpetrated by agents of an employer.

In addition to any shortcomings in the *Padway* decision itself, the majority's contention that backpay can be provided only by an employer conflicts with rulings by a panel of this court as well as the Seventh Circuit, which have found no difficulty in holding that an employer and the employer's agents may be held jointly and severally liable for backpay awards.

*Cornwell v. Robinson,* 23 F.3d 694 (2d Cir.1994), affirmed, on other grounds, a backpay award of $175,000 against an employer and four individual defendants, jointly and severally. Although the defendants apparently did not specifically challenge individual liability in their appeal, the holding suggests that joint and several liability for an award of backpay is not so patently absurd as to justify *Padway*'s categorical proscription. Indeed, as an equitable remedy paid in a monetary sum, an award of backpay is particularly amenable to joint and several liability for the payment of that sum in accordance with general agency principles as dictated by the circumstances of each case.

Similarly, in *EEOC v. Vucitech,* 842 F.2d 936 (7th Cir.1988), Judge Posner, writing for a unanimous panel, affirmed a judgment holding three individual defendants jointly

and severally liable, citing the agent clause in the statutory definition of "employer" and stating that a "district court can order contribution among parties actually named as defendants in the Title VII suit." *Id.* at 939, 942.

As for the availability of reinstatement relief against an employer's agent, the majority acknowledges that there are circumstances where a supervisor will have the authority to rehire, promote, and correct employment records. However, the majority reasons that the mere existence of this authority in some cases should not embolden us to hold agents liable for the reinstatement of a successful plaintiff. On the contrary, it is the majority which boldly chooses to foreclose individual liability in all cases arising under Title VII, contending, categorically, that backpay and reinstatement "can only be provided by employers," while admitting that there may be instances where individual defendants may have the authority to provide precisely the remedy sought by the plaintiff.

As 42 U.S.C. § 2000e–5(g)(1) places the scope of equitable relief within the discretion of the district courts, these courts should also consider the propriety of imposing a reinstatement order against an employer's agent, in addition to or independent of that agent's employer, where the plaintiff has chosen to seek such relief, based on the specific facts of the particular case. It is simply not our place to foreclose remedies provided for under the statute based solely upon our own assessments of the likelihood that a given defendant will have reinstatement authority or that the fact-finding necessary to determine the scope of that authority may be too burdensome.

Finally, Tomka seeks broad injunctive relief, including a declaratory judgment identifying the alleged conduct as violating federal law. The majority offers no rationale to justify limiting liability to the employer where such relief is sought.

The second rationale offered by *Miller* relies upon the fact that the statutory definition of "employer" is limited to those who employ fifteen or more employees (and their agents). *Miller,* 991 F.2d at 587. The *Miller* court suggests, without offering any support for its contention, that Congress "did not want to burden small entities with the costs associated with litigating discrimination claims." *Id.* From this assumption the *Miller* court reasons that, "[i]f Congress decided to protect small entities with limited resources from liability, it is inconceivable that Congress intended to allow civil liability to run against individual employees." *Id.*

There are two flaws to this argument. First, the floor debates concerning Title VII suggest that the minimum employee threshold was not created to protect small "entities" from potential liability, but rather, that it was deemed necessary to justify federal legislation in the employment context under the Commerce Clause. *See, e.g.,* 110 Cong. Rec. 6566 (1964) (letter from minority membership of House Committee on the Judiciary); 110 Cong.Rec. 6548 (1964); 110 Cong. Rec. 7052, 7054 (1964) (remarks of Sen. Humphrey); 110 Cong.Rec. 7088 (1964) (remarks of Sen. Stennis); 110 Cong.Rec.S. 7207–12 (1964) (remarks of Sen. Clark).

Moreover, where Title VII's impact upon small businesses was debated, those debates voiced a concern that federal legislation not intrude upon the intimate—often family—ties which often exist in businesses employing only a handful of people. 110 Cong.Rec. 13,086 (1964). *See generally* Janice R. Franke, Does Title VII Contemplate Personal Liability for Employee/Agent Defendants?, 12 Hofstra Lab.L.J. 39 (1994).

Second, the *Miller* court's reference to Congress' concern for small "entities" is misleading. Where Congress addressed the impact of potential liability, it concerned itself solely with the impact upon small **business,** as opposed to "entities." 110 Cong.Rec. 13,-085–93 (1964) (debate on proposed Cotton Amendment). During those debates, its primary concern was the overall impact upon the economy should a large number of small businesses be forced to litigate discrimination claims. *See, e.g.,* 137 Cong.Rec. 18,336, 18,-337–8 (1991) (remarks of Sen. Hatch); 137 Cong.Rec. 3857, 3874 (1991) (remarks of Rep. Moody). The debate concerning the economic viability of small businesses simply did not concern itself with the potential civil liability

of an employee who discriminates against a co-worker or subordinate.

The proposition that Congress was concerned with the impact of civil liability upon small "entities" is further undermined by the fact that employers and agents of those employers face unlimited civil liability for similar discriminatory acts under 42 U.S.C. § 1981, regardless of the number of persons they employ. *See, e.g., Mitchell v. Keith,* 752 F.2d 385, 388 (9th Cir.), *cert. denied,* 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985); *Mahone v. Waddle,* 564 F.2d 1018, 1029 (3d Cir.1977), *cert. denied,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *Faraca v. Clements,* 506 F.2d 956, 960 (5th Cir.), *cert. denied,* 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975). The liability scheme under § 1981 is of particular relevance to Title VII because proponents of the 1991 amendments to Title VII made "parity" between the damages available under § 1981 and those available under Title VII a stated goal of those amendments. H.R.Rep. No. 102–40(II), 102d Cong. 1st Sess. 24–30 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 717–23 (1992).

The third basis for the *Miller* holding concerns the imposition of liability caps under the 1991 amendments to Title VII.

> [In permitting compensatory and punitive damages], Congress specifically limited the damages available depending upon the size of the respondent **employer**.... [W]e think that if Congress had envisioned individual liability under Title VII for compensatory or punitive damages, it would have included **individuals** in this litany of limitations and would have discontinued the exemption for small employers ...

*Miller,* 991 F.2d at 587–88, n. 2.

As discussed above, Congress may have had other reasons for hesitating to repeal the exemption for small employers. As for the liability caps created under the 1991 amendments, staggered according to the size of the employer, we can only speculate as their purpose. There is no mention of the liability caps in the official legislative history to the amendments. *See* H.R.Rep. No. 102–40(I), 102d Cong., 1st Sess. 142–3 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 671–2 (1992).

H.R.Rep. No. 102–40(II), 102d Cong., 1st Sess. 68–70 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 754–56 (1992).

The floor debate itself reveals a pitched battle between proponents of compensatory and punitive damages and their opponents. As a result, the debate concerns whether or not to impose tort damages, rather than any rationale for creating staggered liability caps according to the size of the employer. It is noteworthy that the 1990 version of the amendments, passed by Congress but subsequently vetoed, limited punitive damages to the greater of either compensatory damages plus backpay, or $150,000, regardless of the number of employees employed. H.R.Rep. No. 101–856, 101st Cong., 2d Sess. 7 (1990); 137 Cong.Rec. 3876, 3884 (1991) (remarks of Rep. Goodling). This again suggests that Congress was primarily concerned with the economic impact of tort liability upon businesses. Viewed in this context, it is not surprising that Congress, seeking a political compromise which would both permit tort-like liability under Title VII and limit its impact upon the economy, did not address the issue of individual liability within its compromise scheme. Certainly, the absence of any mention of individual liability in the 1991 amendments does not, in and of itself, justify a broader conclusion that Congress never contemplated such liability.

The *Miller* reasoning regarding liability caps ultimately rests upon the assumption that Congress could not have intended tort liability to lie against employer's agents because such liability would be too burdensome for individuals to bear. However, it is worth recalling that Title VII liability on the part of an employer's agent must be premised upon a prior finding that the complained-of conduct may properly be imputed to the employer as well. *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 63 (2d Cir.1992) (citing *Meritor,* 477 U.S. at 70–71, 106 S.Ct. at 2407.) Consequently, under a literal reading of the statute, wherever Title VII liability is established, a remedy is available against the employer by *respondeat superior,* as well as against the employer and his agent together, jointly and severally. Therefore, the implication that an employer's

**1324**

agent would be forced to bear the full brunt of Title VII liability, without the agent's employer also bearing a portion of that liability, is illusory. Of course, any inequity which may have been created by the staggered liability caps is of Congress' making and the remedy for it lies solely with that body.

Finally, as noted above, Congress imposed tort damages for Title VII violations, in part, to establish "parity" between the liability schemes under Title VII and 42 U.S.C. § 1981. *See also* H.R.Rep. No. 92–238, 92d Cong., 2d Sess. 19 (1971); S.Rep. No. 92–415, 92d Cong., 2d Sess. 24 (1971). The possibility that an employer's agent might be held liable for tort damages under § 1981 has existed since at least 1975. *See Faraca*, 506 F.2d 956. If individual liability for discriminatory acts was truly beyond the contemplation of Congress, it had ample opportunity to correct those courts which have permitted such liability. Instead, the 1991 amendments broadened the damages available under Title VII and reaffirmed the breadth of liability under § 1981. The apparent political necessity of liability caps within that scheme should not shroud the clear desire on the part of Congress to bolster the broad remedial goals of Title VII. For these reasons, I find *Miller*, and its progeny, ultimately unpersuasive.

In conclusion, I remain convinced, as I was in *Goodstein v. Bombardier*, 889 F.Supp. 760 (D.Vt.1995), that Title VII permits an employer and that employer's agent to be held jointly and severally liable for Title VII violations. The language of the statute permits it, canons of statutory interpretation require it, and the object and overriding policy goals of Title VII warrant it. I would reverse the district court on the issue of individual liability under Title VII for the reasons stated and remand for further proceedings.