Jeffery McCOY, Plaintiffs,

v.

CITY OF NEW YORK, City of New York Parks and Recreation, Parks Commissioner, Jerome Candrilli, Vincent Cascella, Anthony Modafferi, Geraldine Lawless, and George Scarpelli, Defendants.

No. 99 CV 537(ILG).

United States District Court, E.D. New York.

Feb. 14, 2001.

Kenneth W. Richardson, New York City, for Plaintiffs.

Henrique Oliviera, Corporation Counsel, New York City, for Defendants.

### Memorandum & Order

GLASSER, District Judge.

Plaintiff Jeffery McCoy brings this employment discrimination action pursuant to those provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(a)(1), 2000e–3(a), that proscribe a hostile work environment and retaliation; 42 U.S.C. § 1981; the New York City Human Rights Law, N.Y.Exec.Law § 296; and the New York Human Rights Law, N.Y. City Admin.Code §§ 8–101 *et seq.* Defendants the City of New York, the City of New York Parks and Recreation ("Parks Department"), the Parks Commissioner, and Parks Supervisors Jerome Candrilli, Vincent Cascella, Anthony Modafferi, Geral-

dine Lawless, and George Scarpelli collectively move for summary judgment. For the reasons that follow, defendants' motion should be granted.

## BACKGROUND

Plaintiff, an African American, worked for the Parks Department from June 15, 1990 to June 2, 1998. Plaintiff began his tenure at the Parks Department as a seasonal worker and worked his way up to a crew chief and summer supervisor for the Work Experience Program ("WEP") in Staten Island. Plaintiff left the Parks Department in June 1998 due to an injury and has since been on voluntary leave.

Plaintiff has not submitted a separate statement of facts pursuant to Local Civil Rule 56.1 as to which he contends that there exists a genuine issue to be tried, but has submitted a statement of facts within his opposition to the motion for summary judgment. As such, the facts alleged in defendants' Rule 56.1 statement must be deemed admitted. The incidents that predate this action are chronicled in the Complaint and in plaintiff's sworn deposition testimony. In September of 1996, plaintiff was transferred to a Parks Department site in Midland Beach on Staten Island. From that date until July 28, 1997, plaintiff appears to have worked without incident. In a performance evaluation dated July 26, 1997, plaintiff received an overall ranking of "very good," with rankings of "very good" in five categories and "extraordinary" in a sixth category. (Oliviera Decl.Exh. B) According to the form used to evaluate employees, the categories into which an employee could be classified were, in descending order: extraordinary, very good, good, conditional, unsatisfactory and unratable. Plaintiff claimed in his deposition that he should have received "excellents" for his work (McCoy Dep. 65), and that all Caucasian employees at his Parks Department work site received "excellent" rankings in all categories but "didn't deserve it." (*Id.* at 66) Against this backdrop, the discrimina-

tion charged in the Complaint is said to have begun on July 28, 1997 and continued until May 27, 1998.

1. *July 28, 1997 attempted issuance of insubordination charges against co-worker Calluci*

Plaintiff alleges that the first discriminatory incident involved his supervisors' refusal to support his attempt to levy disciplinary charges against one of the employees under his supervision. On July 28, 1997, plaintiff attempted to issue formal written charges for insubordination against Parks Department Employee Peter Calluci. Plaintiff alleges that his supervisor, defendant Vincent Cascella, instructed him to issue a verbal warning instead of a written charge. Plaintiff avers that he had already issued the employee several verbal warnings, and that because the employee had not complied with those verbal warnings, plaintiff decided to prepare a written charge anyway. He contends that he asked defendants Cascella, the Principal Park Supervisor, and Jerome Candrilli, plaintiff's direct supervisor, to witness his write-up of the insubordination charge, but that both refused to do so. Plaintiff was never disciplined as a result of this incident and his salary and benefits, or other material terms and conditions of his employment, were never affected.

2. *January 16, 1998 discussion with defendant Scarpelli concerning defendants Candrilli and Cascella*

Six months later, plaintiff again encountered trouble when he attempted to bring the behavior of his supervisors to the attention of a park chief. On January 16, 1998, plaintiff informed defendant George Scarpelli, Chief of Operations, that defendant Candrilli sat around and discussed ball games during work and that defendant Cascella drank beer during work. (Complaint ¶ 17; McCoy Dep. 74–75)

### 3. *January 23, 1998 verbal altercation with defendant Candrilli*

Shortly after plaintiff reported Candrilli and Cascella to Scarpelli, plaintiff and Candrilli had a dispute over time sheets that escalated into a verbal altercation. At this point, plaintiff apparently had begun to carry to work a tape recorder and a camera. (McCoy Dep. 135–137) According to an unofficial "transcript" of the altercation produced by plaintiff, the problem began when Candrilli stated to plaintiff: "I'm tired of you and your attitude. You got a problem. You and Vinny got a problem. You know what the problem is, you are a rat. You are a rat bastard." Plaintiff then told Candrilli, whose father had apparently recently passed away: "Why don't you grow up and stop crying. You're like little kids . . . Go cry, go cry to daddy. That's all you do like little kids." Candrilli responded with the following: "Let me tell you something. If you mention my family, I will break your fucking neck, you cocksucker. You leave my fucking family out of it." (Pl.'s Exh. 4) Plaintiff does not dispute that race was never explicitly mentioned or even hinted at by Candrilli during this altercation. He further admits that Candrilli threatened his life because of the statements he made to Scarpelli and for no other reason of which he was aware. (McCoy Dep. 75)

### 4. *January 24, 1998 transfer*

One day after this verbal altercation, plaintiff was transferred to another Parks Department site in District 1, the Cromwell Center. Plaintiff testified at his deposition that this transfer was involuntary. (McCoy Dep. 85, 86) He also testified that after this transfer, his title, salary, job responsibilities and salary did not change. (*Id.* at 86, 87)

### 5. *January 27, 1998 supervisory conference with defendant Candrilli*

On January 27, 1998, plaintiff received a "Supervisor's Conference" with defendant Candrilli. According to Candrilli's notes of the meeting, plaintiff was disciplined for: "failure to communicate a change in assignment"; "failure to follow a direct order"; "conduct unbecoming a City employee"; "neglecting assigned duties"; "failure to obey the lawful order of a superior in the agency"; and "engaging in conduct that is prejudicial to good order and discipline." (Oliviera Decl., Exh. E) Plaintiff contends in the Complaint that this disciplinary measure, which remained in his personnel folder, was highly pretextual and that each of the charges listed were fabricated, unfair and highly discriminatory. (Comp.¶ 21) Yet, plaintiff admitted in his deposition that the only reason he believes he received the supervisory conference was in retaliation for the statements he had made on January 16, 1998 to Scarpelli concerning Candrilli and Cascella and that he could think of no other reason for the conference. (McCoy Dep. 78–80)

### 6. *January 28 and 29, 1998 denial of access to Forestry Department bathroom*

The Complaint alleges that on January 28 and 29, 1998, plaintiff and his mostly African American crew were denied use of a bathroom in the Forestry Department facility in Staten Island which apparently was reserved for Forestry Department employees. In his deposition, plaintiff clarifies that his crew was composed of four African Americans and one Caucasian worker and that while crew members were forced to use another bathroom, Forestry Department employees, all of whom were Caucasian, were permitted to use both bathrooms. (Comp.¶ 28) Plaintiff admits that regardless of their race, all WEP workers were denied use of the bathroom in question. However, he suggests that the categorical exclusion of WEP workers by the Forestry Department was linked to race when he testifies that this policy was "very offensive to [him], especially since there was no minorities working in that department." (McCoy Dep. 130) Plaintiff claims that WEP workers may have been

denied the use of this bathroom because Forestry Department employees on Staten Island felt threatened by the WEP workers. (McCoy Dep. 159–160) According to defendants, plaintiff's crew members eventually were permitted to use the bathroom, but only because plaintiff informed the Forestry Department employee that he was a crew chief supervisor. (Defs.' Rule 56.1 Statement ¶ 29, citing McCoy Dep., 116–117)

### 7. *January 30, 1998 order and threat*

On January 30, 1998, plaintiff claims that he was ordered not to go to the sites where defendants Candrilli and Cascella worked unless accompanied by another supervisor (Comp.¶ 24) or unless he obtained "prior approval" (Pl.'s Mem. in Opp'n, 8), whereas Candrilli and Cascella were not similarly ordered. Apparently that same day, plaintiff claims that defendant Scarpelli threatened that if plaintiff continued to complain about conditions at work, he "would be jeopardizing" his summer step-up position as Park Supervisor. (McCoy Dep. 100)

### 8. *February 7, 1998 evaluation*

On February 7, 1998, plaintiff received another performance evaluation in which his overall performance for the period of July 7, 1997 through December 31, 1997 was categorized as "good," one category below his previous evaluation. (Oliviera Decl., Exh. B) Plaintiff testified that he believed that the only reason he received the "good" rating was the statement he made to Scarpelli on January 16, 1998 and that he could think of no other reason which prompted this evaluation.

### 9. *February 10, 1998 supervisory conference with defendant Lawless*

Three days later, on February 10, 1998, plaintiff was given another supervisory conference by defendant Geraldine Lawless, a supervisor. The conference notes charge plaintiff with "disrespectful" and "disruptive" behavior; that he "presumed to question supervisory authority and why

specific supervisors were present at [the work site]"; and finally, that plaintiff was "uncooperative in receiving orders for various details[.]" (Oliviera Decl., Exh. F) In his written response to the conference prepared on the same day, plaintiff admits that he "did get a little loud because [he] was upset" by what he saw at the work site. Specifically, plaintiff contends that he had been promised one day earlier, in a meeting in Scarpelli's office, that neither Cascella not Candrilli were to supervise him and that when he saw both Cascella and Candrilli at the work site and was informed by Lawless that they could in fact supervise him at that particular work site, he "felt betrayed by management." Moreover, plaintiff claims that although he did not directly respond to Cascella, because Cascella addressed him as "Yo McCoy," plaintiff "did receive [his] orders from ... Cascella and [he] did do his job and [he] was cooperative." (*Id.*) As with the January 27, 1998 supervisory conference, the Complaint alleges that this disciplinary measure was highly pretextual and racially motivated. However, plaintiff admits in his deposition that he felt that the only reason he received the conference was in retaliation for the comments he had made on January 16, 1998 to Scarpelli concerning Candrilli and Cascella. (McCoy Dep. 80–81)

### 10. *February 26, 1998 drawing of rat*

On February 26, 1998, plaintiff received a drawing of a rat in the mail. (Comp. ¶ 26; Pl.'s Exh. 7) The Complaint alleges this act was carried out with the object of discriminating and retaliating against plaintiff because of his race. In his deposition, however, plaintiff again attributes this incident to the January 16, 1998 statements he made to Scarpelli. (McCoy Dep. 76–77)

### 11. *March 12, 1998 noose in garage and racially stereotypical advertisement and exclusion from Forestry Department bathroom*

On March 12, 1998, plaintiff observed a noose hanging from the pipes in a working

area of a Forestry Department facility. (Comp. ¶ 29, Pl.'s Exh. 2) At this same facility, plaintiff also observed a painting that contained a "derogatory and stereotypical" advertisement for gunpowder containing a depiction of an African American man and boy on a hunting trip. (Comp. ¶ 30, Pl.'s Exh. 3) At oral argument, it was alleged that plaintiff found the drawing offensive in part because of the exaggerated facial features of the individuals depicted. Plaintiff alleges that he complained about both of these objects to a supervisor, defendant Anthony Modafferi, and that Modafferi not only failed to take any action to remove the objects, but actually posed for a photograph with the noose in plain view. Plaintiff alleges that Chris Mullusky, a Forestry Department climber and pruner, also posed for a photograph with the noose and gestured as though he was going to open up the noose around plaintiff's neck. (Comp. ¶ 31; McCoy Dep. 135–136)

Plaintiff complained about the noose and the offensive advertisement to the Equal Employment Opportunity Officer employed by the Parks Department, Julie Poole, an African American woman, who shared his sentiment. At some point thereafter, Poole apparently informed plaintiff that the offensive material had been removed (McCoy Dep. 132 (not filed with court)), but plaintiff never returned to the site and is not certain whether the objects are still there. (*Id.* at 131)

Plaintiff also testified during his deposition that on this same day, he and his crew members were prevented once again from using the Forestry Department bathroom. (McCoy Dep. 121) The Complaint makes no mention of this incident.

### 12. *April 21, 1998 "fucking nigger" comment*

On April 21, 1998, plaintiff was returning to the Forestry Department when he had a confrontation with defendant Mullusky in which Mullusky called him a "fucking nigger," spat at him, and obscene-ly gestured at him. (McCoy Dep. 135–137) Plaintiff testified that he had seen Mullusky speaking with Cascella frequently. Plaintiff reported this incident on April 24, 1998 in a statement to the Parks Department Investigation Unit. (Oliviera Decl., Exh. G) In a memorandum dated April 27, 1998, Mullusky disputed plaintiff's version of the events and claimed that plaintiff approached him in an aggressive manner, called him "trash" and "faggot," and wrote down his personal vehicle license plate number. In a hand-written note dated July 20, 1998, Mullusky further stated: "On this particular day, I had said no racial slurs to this individual." (*Id.*, Exh. H) Three other Parks Department employees submitted statements that contradicted plaintiff's version of the events and, after conducting an investigation, a Parks Department investigator concluded on August 5, 1998 that there was insufficient evidence to support plaintiff's allegations. (*Id.*) When questioned in his deposition about whether he had ever before been addressed in a derogatory manner, plaintiff testified that although he had never before been called a "nigger" by Parks Department employees, he had been referred to as "boy" (McCoy Dep. 137–138) and had been told to "whip" his crew into shape (*id.* at 197–198), both of which plaintiff found to be racially-offensive.

### 13. *June 30, 1998 Equal Employment Opportunity Commission ("EEOC") charge*

Plaintiff filed a complaint with the EEOC on June 30, 1998, in which he charged that, between the dates of January 23, 1998 and May 27, 1998, he was subjected to discrimination based on his race and color in the form of retaliation for complaining of harassment at his job. (Oliviera Decl., Exh. I) On December 1, 1998, the EEOC issued plaintiff a "Right to Sue" letter. He filed the instant Complaint on January 27, 1999.

Defendants now move for summary judgment on all of plaintiff's claims pursuant to Federal Rule of Civil Procedure 56.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment under Rule 56 is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of proof on such motion. *See United States v. All Funds,* 832 F.Supp. 542, 550–51 (E.D.N.Y.1993).

If the summary judgment movant satisfies its initial burden of production, the burden of proof shifts to the nonmovant who must demonstrate that a genuine issue of fact exists for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56). Once the nonmovant has adduced evidence of a genuine issue of material fact, its "allegations [will be] taken as true, and [it] will receive the benefit of the doubt when [its] assertions conflict with those of the movant." *Samuels v. Mockry, et al.,* 77 F.3d 34, 36 (2d Cir.1996).

### II. Title VII, New York Human Rights Law and N.Y. City Human Rights Law

Title VII of the Civil Rights Act of 1964 governs claims of discrimination on the basis of race, 42 U.S.C. § 2000e–2(a)(1), and claims of retaliation for conduct aimed to remedy such discrimination, 42 U.S.C. § 2000e–3(a). New York Human Rights Law, in pertinent part, makes it unlawful for an employer "because of the . . . race, creed [or] color . . . of any individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y.Exec.Law § 296(1)(a). In addition, § 296(6) of the Human Rights Law prohibits any person from aiding and abetting any of the acts forbidden in the statute. New York City's version of the Human Rights Law, N.Y. City Admin Code, § 8–107, also contains a provision regarding aiding and abetting which is worded exactly the same as § 296(6) of the New York Human Rights law. Because New York courts require the same standard of proof for claims brought under the Human Rights Law as for those claims brought under Title VII, *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995), these claims may be analyzed in tandem.

While plaintiff has not distinguished among the various named defendants for purposes of liability under Title VII, an individual employee may not be held liable under Title VII. *See Tomka,* 66 F.3d at 1317. As such plaintiff's Title VII claim is considered only as against the City and the Parks Department.

In contrast, New York Human Rights Law provides that an individual employee may be liable for discriminatory conduct if the employee actually participates in the conduct giving rise to a discrimination claim. *See id.* at 1317 (noting that the New York Court of Appeals held in *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11

(1984), that an employee is not individually subject to suit under § 296 "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others[,]" but that other courts have distinguished *Patrowich* where a defendant participates in the allegedly discriminatory conduct) (citing *Poulsen v. City of North Tonawanda, N.Y.*, 811 F.Supp. 884, 900 (W.D.N.Y. 1993); *Bridges v. Eastman Kodak Co.*, 800 F.Supp. 1172, 1180–81 (S.D.N.Y.1992); *Wanamaker v. Columbian Rope Co.*, 740 F.Supp. 127, 135–36 (N.D.N.Y.1990); *but see Falbaum v. Pomerantz*, 891 F.Supp. 986 (S.D.N.Y.1995)); *see also Hicks v. IBM*, 44 F.Supp.2d 593, 599 (S.D.N.Y. 1999) (permitting plaintiff to assert claim under § 296 against individual defendants). Although the plaintiff in *Tomka* failed to allege that the individual defendants had an "ownership interest" or possessed sufficient supervisory control over the work site, her allegation that the individual defendants had assaulted her and thereby created a hostile working environment was sufficient to satisfy § 296. Because plaintiff here alleges that defendants Candrilli, Cascella, Modaferri, Lawless and Scarpelli each participated in the creation of a hostile work environment or retaliated against him for protected activity, his § 296 claim is considered with respect to all named defendants.

### A. *Hostile Work Environment*

Title VII prohibits an employer's conduct that "has the purpose or effect of ... creating an intimidating, hostile, or offensive working environment." *Tomka*, 66 F.3d at 1305 (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). A hostile work environment exists "when the workplace is permeated with 'discriminatory intimidation, ridicule; and insult' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295

(1993) (quoting *Meritor*, 477 U.S. at 65, 67, 106 S.Ct. 2399).

### 1. *Incidents that may be imputed to the City or the Parks Department*

■ A plaintiff, in order to recover under Title VII, must show not only that the environment is hostile but also that "the conduct which created the hostile environment should be imputed to the employer." *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (2d Cir.1992) (citing *Meritor*, 477 U.S. at 70–71, 106 S.Ct. 2399). An employer is presumptively liable for all acts of harassment perpetrated by an employee's supervisor, but the employer can avoid liability if it can prove that: "(1) the employer exercised reasonable care to prevent and promptly correct any harassment by such a supervisor, and (2) the employee unreasonably failed to avail himself of any corrective or preventative opportunities provided by the employer or to avoid harm otherwise." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767 (2d Cir.1998) (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Unlike allegations of harassment by supervisors, employers generally will not be liable for allegations of harassment by co-workers "unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it." *Tomka*, 66 F.3d at 1305 (citation omitted).

■ Because each of the individual defendants named in the caption were supervisors, the Parks Department is presumptively responsible for any discrimination they may have manifested against McCoy. Defendants have failed to offer evidence to rebut this presumption, and the court, accordingly, imputes the conduct of plaintiff's individual supervisors to the Parks Department. Of the many incidents alleged by plaintiff, only one involved a co-worker, Keith Mullusky. While plaintiff stated in

his deposition that he believed Mullusky was a supervisor (McCoy Dep., 136), the bulk of the evidence in the record suggests that he was not. (Comp. ¶ 32 (describing Mullusky as an "employee"); Pl.'s Mot. in Opp'n, 3 (same); Defs.' Rule 56.1 Statement, ¶ 46 (same); Oliviera Decl. Exh. H (investigation report describing Mullusky as a "climber and pruner")) Plaintiff has not alleged that the Parks Department either failed to provide a reasonable avenue of complaint or knew of Mullusky's conduct but ignored it. Nor can he, in view of the investigation opened by the Parks Department on April 21, 1998 and closed with no conclusive findings substantiating plaintiff's story on August 5, 1998. (Oliviera Decl. Exh. H) As such, Mullusky's conduct cannot be imputed to the Parks Department.

### 2. *Incidents that may be considered*

■ As a preliminary matter, the court may only consider incidents contributing to the purportedly hostile work environment alleged to have occurred within the limitations period or incidents that occurred beyond the period if plaintiff can demonstrate a "continuing violation." Title VII requires a claimant to file a discrimination charge with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a proper state or local equal employment agency, within 300 days of the alleged act of discrimination. *See* 42 U.S.C. § 2000e–5(e)(1); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996). Because McCoy filed his race-discrimination charge with the EEOC on June 30, 1998, his Title VII claim cause of action would normally include any incidents alleged to have occurred in the preceding 180 days; thus, any incidents alleged to have occurred prior to January 1, 1998, would be time-barred under Title VII. If McCoy can show that he was subjected to a "continuing violation" of such a character as to extend the limitations period, however, the court may consider acts that occurred outside of the limitations

period. The continuing-violation exception "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998) (quoting *Annis v. County of Westchester*, 136 F.3d 239, 246 (2d Cir.1998)). "[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Quinn*, 159 F.3d at 765–66 (citing *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993)). However, a continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Quinn*, 159 F.3d at 766 (citing *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir.1994)).

McCoy's cause of action under New York's Human Rights Law is governed by a three-year statute of limitations period, measured from the filing of the action in court. *See* N.Y. CPLR § 214(2); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996). This action was filed on January 27, 1999 and thus, for purposes of the state-law cause of action, any incidents of discrimination alleged to have occurred prior to January 1996 would ordinarily be time-barred.

Each of the acts McCoy alleges falls within the three-year period proscribed by New York law and each of those acts, with the exception of one, falls within the 180 period proscribed by Title VII. The only act that falls beyond the 180 day time period is McCoy's attempted issuance of insubordination charges against Parks Department employee Peter Calluci on July 28, 1997. Because that act precedes by approximately six months the first allegedly discriminatory act that occurred within

the 180 day period, it is not so "isolated in time . . . as to break the asserted continuum of discrimination." *Quinn*, 159 F.3d at 766 (where gap exceeding one year between discriminatory events negated the plaintiff's allegation of a continuing violation). Even so, plaintiff has not put forth satisfactory evidence that the July 28, 1997 incident was the result of, or marked the beginning of, a "discriminatory policy or mechanism." As such, this incident cannot be viewed as part of a continuing violation and may not be considered in this motion.

### 3. *The work environment at the Parks Department*

Turning to the question of whether the acts alleged to have occurred within the relevant time period constitute actionable harassment, the court must consider whether these acts amount to "discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Quinn*, 159 F.3d at 767 (citing *Harris*, 510 U.S. at 21, 114 S.Ct. 367). Whether a working environment is sufficiently hostile or abusive depends on the "totality of circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The conduct alleged must be severe and pervasive enough to create an environment that "would be reasonably perceived, and is perceived, as hostile or abusive." *Schwapp*, 118 F.3d at 110 (citing *Harris*, 510 U.S. at 22, 114 S.Ct. 367).

■ For acts of racial discrimination such as racist comments, slurs and jokes to be actionable, there must be "more than a few isolated incidents of racial enmity, . . . meaning that instead of sporadic racial slurs there must be a steady barrage of opprobrious racial comments[.]" *Schwapp v. Town of Avon*, 118 F.3d 106, 110–11 (2d Cir.1997) (internal citations and quotations omitted); *see also Tomka*, 66 F.3d at 1305 n. 5 ("the incidents of harassment must occur in concert or with a regularity that can reasonably be termed persuasive"); *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577–78 (2d Cir.1989) (the alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."). Whether such slurs constitute a hostile work environment typically depends upon their "quantity, frequency, and severity[,]" which should be "considered cumulatively in order to obtain a realistic view of the work environment." *Schwapp*, 118 F.3d at 110–11.

■ Plaintiff in this case has alleged four sets of incidents which he claims show that the Parks Department was plagued by a pervasive and continuous atmosphere of racial discrimination. The first set of incidents revolves around plaintiff's troubled relationship with two of his supervisors, defendants Candrilli and Cascella. Shortly after he reported Candrilli and Cascella's improper behavior on the job to Scarpelli, plaintiff alleges that Candrilli called him a "rat bastard" and threatened his life; that he was involuntarily transferred to a different work site; that he was written up in two separate supervisory conferences; that he was given poor performance evaluations; and that he received a drawing of a rat in the mail. The second set of incidents involved the exclusion of plaintiff and his work crew on two separate occasions from a bathroom that was limited to Forestry Department employees, who all happened to be Caucasian. The third set of incidents involved the display of a noose and what the plaintiff perceived to be racially offensive advertisement at a Parks Department work site. The fourth and final incident involved a confrontation between plaintiff and his co-worker, Chris Mullusky, in which Mullusky directed racist comments and obscene gestures at plaintiff.

Accepting as true all of these incidents, McCoy has not adduced evidence sufficient

to support a finding that he was subject to abuse of sufficient severity or pervasiveness as to "alter the conditions of his employment," *Harris*, 510 U.S. at 21, 114 S.Ct. 367. While the incidents involving Candrilli and Cascella suggest that they disliked plaintiff for his decision to report them to another supervisor, there is nothing in the portions of plaintiff's deposition that have been provided by the parties or in the Complaint that suggests the incidents involving Candrilli and Cascella were motivated by racial animus. In fact, when questioned directly about why he felt Candrilli and Cascella targeted him, plaintiff repeatedly answered that he believes it was because of the comments he made to Scarpelli.

■ With respect to the incidents involving plaintiff's exclusion from the Forestry Department bathroom, plaintiff again fails to establish that racial hostility motivated his exclusion. Even as described by plaintiff, the policy that excluded plaintiff and his WEP crew, one of whom was Caucasian, from this bathroom was enforced uniformly against all WEP workers, not only minority WEP workers, and was, according to plaintiff, motivated by a dislike on the part of Forestry Department employees of WEP workers because they felt that WEP participants "were going to take their jobs away." (McCoy Dep., 160) While it may be true that Forestry Department employees were all Caucasian, absent a showing that this policy was selectively enforced, plaintiff's allegation is insufficient to convert what appears to be an otherwise neutral policy into a racially discriminatory one.

■ As for the third set of incidents involving the display of a noose and a racially offensive advertisement of an African American man and boy with exaggerated facial features, these reasonably could have been perceived by and were in fact perceived by plaintiff as racially-hostile. *Snell v. Suffolk County*, 782 F.2d 1094, 1098 (2d Cir.1986) (finding employer liable for hostile working environment where mi-

nority officers witnessed a "proliferation of racially derogatory 'literature' posted on bulletin boards ... [including] photographs favorably portraying the Ku Klux Klan ... [and] a picture of a black man with a noose around his neck...."). Likewise, it can also be said that plaintiff was justified in perceiving the fourth incident involving the confrontation with Mullusky as racially-hostile. That these incidents were racially offensive, however, is insufficient to establish a hostile work environment under Title VII, which requires more than isolated comments or actions. *Snell*, 782 F.2d at 1098 (finding that "continuous and pervasive" incidents established hostile environment where minority police officers were "repeatedly subjected to offensive racial epithets," including the "daily usage of such slurs as 'nigger,' 'coon,' and 'black bitch.' "). To be actionable, Title VII requires that incidents of harassment must "occur in concert or with a regularity that can reasonably be termed pervasive." *Tomka*, 66 F.3d at 1305 n. 5 (citing *Carrero*, 890 F.2d at 577 and *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir.1992)); *see also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987) (concluding that plaintiff failed to show that the "incidents ... of harassment occurred either in concert or with regularity that [could] reasonably be termed pervasive," and therefore failed to establish a racially hostile work environment).

Unlike in *Schwapp*, where plaintiff alleged ten separate incidents of racially-hostile comments (two of which occurred in his presence) that, viewed together, justified his perception that his work environment was rife with hostility towards minority groups, plaintiff here has not alleged facts that altered the conditions of his employment and created an abusive work environment. At most, he has alleged two separate incidents that, while conceivably offensive, are insufficient to permit a trier of fact to conclude that they pervaded McCoy's work environment.

Accordingly, plaintiff fails to establish a triable issue of material fact on his claim of hostile work environment.

### B. *Retaliation*

■ Title VII also prohibits an employer from retaliating against an employee for participation in proceedings aimed to combat discrimination. *See* 42 U.S.C. § 2000e–3(a). Retaliation claims are tested under the three-step burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir.1996); *Tomka,* 66 F.3d at 1308. First, the plaintiff must make out a prima facie case of retaliation. *See Tomka,* 66 F.3d at 1308. To make out a prima facie case of retaliation, a plaintiff must show: (1) participation in statutorily protected conduct or expression known to the employer; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See id.* at 1309; *Van Zant,* 80 F.3d at 714. Second, after plaintiff makes out a prima facie case, the employer has the burden of articulating a legitimate, non-discriminatory reason for the action. Third, if the employer meets its burden, plaintiff must adduce evidence "sufficient to raise a fact issue" as to whether the employer's reason was "merely a pretext" for impermissible retaliation. *See Tomka,* 66 F.3d at 1309; *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998) (applying these burden shifting rules in the context of motion a for summary judgment).

■ Turning to this case, plaintiff has met his burden only on the first element of the prima facie case. The first time McCoy complained to his employer of race discrimination was when he spoke with EEO Officer Julie Poole in March 1998. This is sufficient to satisfy the first prong. *See, e.g., Tomka,* 66 F.3d at 1308; *Kotcher,* 957 F.2d at 65 (internal complaints to company management about sexual harass-

ment constitute protected activity). However, McCoy has articulated neither an adverse employment action which disadvantaged him nor a causal connection between the protected activity and such adverse action. Even accepting plaintiff's version of the events as true, the second and third elements of the prima facie case are undermined by his repeated testimony that the terms and conditions of his work (including his salary, benefits, job responsibilities and hours) did not change as a result of a complaint concerning the perceived racial harassment The only three employment actions plaintiff has alleged were adverse are that he was involuntarily transferred to a different work site, that he was subjected to a supervisory conference, and that he received a ranking of "good" in a performance evaluation. However, plaintiff testifies repeatedly that none of these actions imposed any adverse consequences on his job. In fact, he even concedes that these actions do not constitute "the kind of retaliation that is protected under Title VII." (Pl.'s Mem. in Opp'n, 8) More significantly for purposes of the prima facie case, plaintiff admits repeatedly that those three actions were taken as a result of his January 16, 1998 statements to Scarpelli, in which race was never mentioned or hinted at, and *not* as a result of his attempt to seek recourse for what he believed to be racial discrimination. Because plaintiff fails to articulate the second and third elements of the prima facie case, the court need not address the remaining portions of the *McDonnell Douglas* scheme. As such, plaintiff's efforts to establish a genuine issue of fact as to the Parks Department's retaliation against him must fail.

### C. *New York State and City Human Rights Laws*

■ For the same reason that plaintiff's Title VII claim against the City and the Parks Department fails, his claim against those defendants based on the New York Human Rights Law, N.Y.Exec.

Law § 296(1)(a), and the New York City Human Rights Law, N.Y. City Admin.Code § 8-107, also must fail. *Van Zant*, ("Except for the different periods of proscription, [plaintiff's] claims under New York Human Rights Law and Title VII are ... essentially identical."); *Tomka*, 1304 n. 4 (same); *DeWitt v. Lieberman*, 48 F.Supp.2d 280, 294 (S.D.N.Y.1999) (holding that dismissal of plaintiff's New York Human Rights Law claims warrants dismissal of New York City Human Rights Law "because the wording of the provisions ... are identical").

As for his claims against the individual defendants, which are barred under Title VII but not under the state or city Human Rights Law, these too must fail under § 296. A claim against an individual employee under § 296(1) requires a showing that the employee "has an ownership interest or any power to do more than carry out personnel decisions made by others." Even assuming that plaintiff could establish that racial hostility motivated any of the incidents he describes, plaintiff fails to allege that any of the individual employees named as defendants had the direct power to fire him. A claim against an individual employee also is available under § 296(6), which makes it unlawful for "any person" to aid or abet the violation of the statute. While some courts have required a plaintiff to establish employer liability *before* imposing liability for aiding and abetting against other employees, other courts have permitted recovery against individual defendants under this provision on the lesser showing that the "defendant actually participates in the conduct giving rise to a discrimination claim." *Tomka*, 66 F.3d at 1317 (holding that plaintiff's allegation that "each of the individual defendants assaulted her and thereby created a hostile environment" is sufficient to satisfy § 296(6)); *Steadman v. Sinclair*, 223 A.D.2d 392, 636 N.Y.S.2d 325 (1st Dept 1996) (adopting *Tomka's* holding); *Peck v. Sony Music Corp.*, 221 A.D.2d 157, 632 N.Y.S.2d 963 (1st Dept 1995) (same); *com-pare, DeWitt v. Lieberman*, 48 F.Supp.2d 280, 293 (S.D.N.Y.1999) (holding that under New York law the plaintiff could not prevail against a co-employee until she established employer liability, and that "an employer cannot be held liable for an employee's discriminatory act unless the employer became party to it by encouraging, condoning or approving it.") (citations omitted); *Hicks v. IBM*, 44 F.Supp.2d 593, 600 (S.D.N.Y.1999) (same); *Trovato v. Air Express Int'l*, 238 A.D.2d 333, 655 N.Y.S.2d 656 (2d Dep't 1997) (regarding *Tomka* holding as contrary to the statutory term "employer" in § 296(1) and the authority of *Patrowich* in defining the term); *Foley v. Mobil Chemical Co.*, 170 Misc.2d 1, 647 N.Y.S.2d 374 (1996) (same).

Following the Second Circuit's interpretation of § 296(6) in *Tomka*, it can be assumed that a claim under this provision is available against an individual defendant who engages in discriminatory conduct that produces a hostile work environment. However, the facts of this case do not rise to the level of severity that warranted the court's conclusion in *Tomka* that plaintiff's claims against the individual defendants should survive. For reasons already discussed, plaintiff has clearly failed to allege racial animus in the incidents involving Candrilli and Cascella and in the policy excluding him from the Forestry Department bathroom. Moreover, while plaintiff arguably may have been justified in perceiving the noose and the advertisement as racially-offensive, the display of these objects does not clearly rise to the level of discrimination. Plaintiff saw the objects on only two occasions (the advertisement once and the noose once) and, as soon as he complained about them, they were immediately removed. As for plaintiff's allegations with respect to Mullusky's derogatory comments, the lack of strong factual support for this comments is evident from the Parks Department's investigation. Three separate witnesses, whose credibility plaintiff has not questioned, did not hear Mullusky say the word "nigger." Even assuming that all three witnesses

were mistaken or lied during the investigation, plaintiff's own testimony suggests that his work environment was not changed as a result of this comment, as plaintiff did not work directly with Mullusky. As such, plaintiff's § 296 and § 8–107 claims against the individual defendants do not rise create a genuine issue of material fact.

### III. *42 U.S.C. § 1981*

 Plaintiff has also alleged a violation of 42 U.S.C. § 1981. To establish a claim under § 1981, a plaintiff first must allege a substantive violation of his rights to make contracts under color of state law and, second, that the defendants can be held liable for that violation. *See Philippeaux v. North Cent. Bronx Hosp.*, 871 F.Supp. 640, 654 (S.D.N.Y.1994). To satisfy the first prong, a plaintiff must allege the following: "(1) [he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993) (remanding to give *pro se* plaintiff opportunity to amend complaint which "fails to offer more than conclusory allegations that he was discriminated against because of his race.") (internal citation omitted).

Whether in the context of direct discrimination in the form of a hostile work environment or retaliation, plaintiff must specifically allege that the discrimination charged took place "*because of* the individual's race" and must support this charge with "more than conclusory allegations." *Id.* (emphasis added); *see also Albert v. Carovano*, 851 F.2d 561, 571–72 (2d Cir. 1988) ("Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory, ... and racially motivated.") (citing *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141,

73 L.Ed.2d 835 (1982) and *Zemsky v. City of New York*, 821 F.2d 148, 150 (2d Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987)). The statute of limitations in New York for a § 1981 claim is three years. *See Wilson v. Fairchild Republic Co., Inc.*, 143 F.3d 733, 739 n. 5 (2d Cir.1998).

Applying these principles to this case, it is apparent that plaintiff has failed to allege the prima facie elements of a § 1981 claim. The second cause of action delineated in the Complaint contains nothing but conclusory allegations that plaintiff has failed to substantiate in either his moving papers—which do not contain even a single reference to § 1981—or his deposition. Despite plaintiff's failure to address the § 1981 claim in a meaningful manner, the claim can be analyzed in the same manner as his Title VII claim. *Carrion v. Yeshiva Univ.*, 535 F.2d 722 (2d Cir.1976) ("the protection against discrimination in employment provided by § 1981 is essentially analogous to Title VII."); *Rose v. Mendon Leasing Co.*, 969 F.Supp. 865, 867 n. 2 (E.D.N.Y.1997) ("It is well-settled that claims under 42 U.S.C. § 1981 are to be resolved under the same analytical framework as Title VII claims ... the Court's disposition of the Title VII claim will apply with equal force to the § 1981 claim."); *see also Philippeaux*, 871 F.Supp. at 654 (citation omitted). As was true with respect to plaintiff's Title VII claim, even a generous reading of the Complaint and plaintiff's other submissions reveals no evidence of race-based discrimination. To the contrary, plaintiff's deposition provides persuasive evidence that the disciplinary actions taken against plaintiff, as well as his poor performance reviews and involuntary transfer were motivated not by an intent to discriminate on the basis of race but, rather, by the troubles that ensued after plaintiff reported the misconduct of his supervisors to Chief of Operations Scarpelli. As for the noose and the drawing, "a complaint that identifies other possible motives, combined with a lack of specific fac-

tual support of racial animus, contradicts a claim of racial discrimination." *See Hicks v. IBM*, 44 F.Supp.2d 593, 598 (S.D.N.Y. 1999) (citing *Yusuf v. Vassar College*, 35 F.3d 709, 713–14 (2d Cir.1994)). Defendants contend that the noose was there as a reminder of the dangers that might befall tree climbers and pruners if they are not careful (McCoy Dep. 127) and the drawing was nothing more than a harmless advertisement for gun powder. Moreover, other than his own perceptions, plaintiff has provided no factual support of racial animus. Plaintiff's allegation against Mullusky, when viewed with the statements of the three other employees submitted during the investigation, also lacks the "specific factual support" needed to establish racial animus.

■ Even assuming that he did allege a substantive violation of § 1981, plaintiff also must establish that defendants can be held liable for that violation. The Complaint does not distinguish among the various named defendants for purposes of liability under § 1981 and, accordingly, it must be assumed that plaintiff asserts a violation of § 1981 as against each of the individual defendants as well as the municipality and the Parks Department.

As for plaintiff's claims against the City of New York and the Parks Department, plaintiff must prove that these defendants can be liable for the individual acts of their employees. *Philippeaux*, 871 F.Supp. at 654. The Supreme Court addressed the issue of municipal liability in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), a decision that preceded Congress' amendment of the Civil Rights Act of 1991. The *Jett* Court held that § 1981 did not permit the imposition of vicarious liability on municipalities for the actions of their employees and that a plaintiff seeking to hold a municipal entity liable must allege a violation of § 1983 and meet the requirements of *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Jett*, 491 U.S. at 721,

109 S.Ct. 2702. When it enacted the Civil Rights Act of 1991, Congress approved subsection (c) to § 1981, which expressly provided recovery for violations of § 1981(a) "under color of state law." As at least one district court has stated, however, Congress' amendment in 1991 of subsection (c) did not undercut the portion of *Jett* which permitted municipal liability to arise only where the injury is caused by municipal policies or customs pursuant to *Monell*. *Philippeaux*, 871 F.Supp. at 656 ("*Jett* continues to state accurately the law under which municipalities may be held liable for Section 1981 violations by their employees or agents. Therefore, to assert a Section 1981 claim against municipal entities, as plaintiff has done in this case, plaintiff must allege a violation of Section 1983 and meet the requirements of *Monell*. Because ... plaintiff has failed to assert a violation of Section 1983, his Section 1981 claim is dismissed without prejudice.") (internal citations omitted); *see also Fisher v. City of New York*, 1992 WL 77606, 1992 U.S. Dist. LEXIS 3436, *7 (S.D.N.Y.1992) (post–1991 case citing *Jett* for proposition that "express cause of action for damages under § 1983 constitutes exclusive federal remedy for violations of § 1981"). Under *Monell*, municipal liability is only available "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

Applying these principles to McCoy's allegations, it is apparent that his allegations fail to satisfy the requirements needed to hold a municipality liable under § 1981. In *Philippeaux*, 871 F.Supp. at 652–53, the court found that although plaintiff had alleged sufficient facts to make out a substantive violation of § 1981, he failed to establish that the actions taken by his supervisors, even if they were discriminatory, were a result of an official policy of the City or its agencies. Plaintiff here not only has failed to allege facts establishing

a substantive violation of § 1981, but also has failed to allege an official policy of discrimination on the part of either the City or the Parks Department.

As for plaintiff's claims against the individual defendants pursuant to § 1981, the Second Circuit has not definitively answered the question of whether § 1981 provides for liability against individual employees. *See Hicks v. IBM*, 44 F.Supp.2d 593, 596 (S.D.N.Y.1999) (recognizing lack of clarity in Second Circuit but nonetheless permitting plaintiff to pursue § 1981 claims against individual defendants). As the court in *Hicks* recognized, the Circuit "in reaching its conclusion that Title VII did not contemplate individual liability, the court in *Tomka* took pains to distinguish § 1981 from Title VII[, which] strongly suggests that individuals can be held liable under § 1981." *Id.* (citing *Ayton v. Lenox Hill Hospital*, No. 93 Civ. 6601, 1997 WL 10000 *8 (S.D.N.Y. Jan.10, 1997); *Northup v. Connecticut Comm'n on Human Rights & Opportunities*, No. Civ. 3:97–211, 1998 WL 118145 *3 (D.Conn. Feb.2, 1998); *Amin v. Quad/Graphics, Inc.*, 929 F.Supp. 73, 78 (N.D.N.Y.1996)). In view of plaintiff's failure to provide factual support establishing an intent to discriminate or to allege facts sufficient to raise an inference of racial motivation on the part of any of the individual defendants, the issue of whether § 1981 is available as against the individual defendants need not be resolved here, and plaintiff's claims against the individual defendants should be dismissed.

## CONCLUSION

For the foregoing reasons, summary judgement on each of plaintiff's claims is appropriate and is hereby granted.

SO ORDERED.